UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DELIVERY KICK HOLDINGS, INC.,

    Plaintiff,

v.                                                                  Case No: 8:24-cv-1506-KKM-NHA

RJ BROOKSHER LLC, and
RILEY BROOKSHER,

    Defendants.
_____

## ORDER

Plaintiff Delivery Kick Holdings, Inc., (DKH) seeks a preliminary injunction against Defendants RJ Brooksher, LLC, (RJB) and RJ Brooksher, an individual and the sole member of RJB. Mot. for Prelim. Inj. (MPI) (Doc. 12). DKH requests an order requiring the defendants to restore the deleted software and database to DKH as well as prohibiting the use or disclosure of the software or database by the defendants. *Id.* Because DKH has not shown a substantial likelihood of success on the merits, the motion is denied.

I.    BACKGROUND

DKH is a Florida corporation that was formed in 2023 to develop and host a mobile food delivery application. Am. Compl. (Doc. 11) ¶¶ 1, 7. Kimball is the President and Director of DKH. Kimball Decl. (Doc. 12-1) ¶ 2. Brooksher is a "computer programmer

and software developer," and provides those services for a fee. Brooksher Decl. (48-1) ¶ 3. He is the owner and sole member of RJB. *Id.* ¶ 2; *see also* Am. Compl. ¶ 2.

Initially, Kimball hired Brooksher to consult on unrelated software. *Id.* ¶ 5; *accord* Kimball Decl. ¶ 8. Shortly thereafter, Kimball requested that Brooksher consult on a food delivery application called Delivery Kick that Kimball had begun to develop through a programming team company called MindBowser. Brooksher Decl. ¶ 6; *accord* Kimball Decl. ¶ 9. Brooksher's work on this application was limited to testing and managing the MindBowser team. Brooksher Decl. ¶ 9; *accord* Kimball Decl. ¶ 11. In April 2023, Kimball and Brooksher discussed forming a food delivery service business (to be called DKH). Brooksher Decl. ¶ 13; *accord* Kimball Decl. ¶ 13.

The facts after this meeting are sharply contested. Kimball's view of the facts are as follows. During the meeting where Brooksher and Kimball discussed forming a business, it was agreed that Kimball would own 75% of the company and Brooksher would own 25%. Kimball Decl. ¶ 14. Brooksher agreed to reduce his hourly rate for programming services. *Id.* Both parties were ready to form the company, but a printing glitch prevented them from signing the papers when they met with counsel. *Id.* ¶ 15. Still, Brooksher "continued to work with DKH as officer and director" of DKH, even signing a business contract listing him as "CTO." *Id.* ¶ 17.

Before Brooksher's departure from the company on June 10, 2024, he reviewed code from programmers, assembled, and tested it. *Id.* ¶ 21. By the time the application was ready to launch in May 2024, DKH had spent about $75,000 on third-party software developers and paid $80,000 to Brooksher. *Id.* ¶ 22. The coding of the application, which worked "in conjunction with the proprietary database," provided a "significant advantage versus other options on the market." *Id.* ¶ 31.

Just before the relationship collapsed, Brooksher transferred the software into his own repositories and then deleted all snapshots of the software, thereby depriving Kimball and DKH of any ability to use it. *Id.* ¶ 32. The functionality of the application "collapsed" without the software. *Id.* ¶ 35. Brooksher then filed a copyright application for the software. *Id.* ¶ 33.

According to Brooksher, he and Kimball never came to an agreement on DKH's formation. Brooksher Decl. ¶ 19. Brooksher never had an official role at DKH, and "felt uncomfortable" with the draft shareholder agreement, so refused to sign it. *Id.* ¶ 18. Only after the lawsuit was filed did Brooksher learn he was listed in DKH's incorporation papers and as a signatory. *Id.* ¶¶ 20, 21.

Regarding the software, Brooksher disputes Kimball's characterization of the software and database. He created the application on his personal computer, and it "differ[ed] substantially" from what Kimball and DKH consultants were producing. *Id.*

3

¶ 16. The software that Kimball refers to as "the application," according to Brooksher, is a "basic data aggregation application" that was developed by MindBowser and did not have a database. *Id.* ¶¶ 16, 28. While Brooksher developed his own application, he continued to consult on the MindBowser application. *Id.* ¶ 26. To this day, Kimball still has access to the MindBowser software. *Id.* ¶ 32. Brooksher "did not delete any of the DKH code," and only removed "backups . . . of the software that [he] authored" to "prevent Kimball from unlawfully copying" his software. *Id.* ¶¶ 32, 33.

After the falling out, DKH sued claiming violations of the Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and the Computer Fraud and Abuse Act, plus civil conversion, fraud, and breach of fiduciary duty. Am. Compl. ¶¶ 24–71. Although an evidentiary hearing on this motion was scheduled, (Doc. 53), the parties moved to cancel the hearing and for a ruling based on the submitted papers, Joint Motion to Cancel Hearing (Doc. 54) (Joint Mot. to Cancel); *see* (Doc. 55).

## II.   STANDARD OF REVIEW

To warrant a preliminary injunction, a movant must establish (1) "a substantial likelihood of success on the merits;" (2) "irreparable injury" without an injunction; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc); *accord*

*Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Since a "preliminary injunction is an extraordinary and drastic remedy," courts are not to grant it "unless the movant clearly establishes the burden of persuasion as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (quotation omitted). Accordingly, "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc.*, 557 F.3d at 1198.

## III. ANALYSIS

### A. Plaintiff Seeks an (Extra) Extraordinary Form of Equitable Relief

Federal courts exercise equitable jurisdiction by virtue of the Article III authority to award remedies. U.S. CONST. art. III, §§ 1-2. For "Cases" in "Equity," *id.*, "the jurisdiction in equity exercised by the High Court of Chancery in England at the time of the adoption of the Constitution and the enactment of the original Judiciary Act, 1789 (1 Stat. 73),' " limits Article III courts' equitable powers, *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (quoting A. Dobie, HANDBOOK OF FEDERAL JURISDICTION AND PROCEDURE 660 (1928)). Consequently, a district court may not "create remedies previously unknown to equity jurisprudence." *Id.* at 332.

DKH seeks a preliminary injunction, which "is a powerful exercise of judicial authority in advance of trial." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). "The chief function of a

preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1178–79 (11th Cir. 2020) (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors*, 896 F.2d at 1284). Preserving the status quo "prevents one party from destroying the court's basis for vindicating the other party." Samuel L. Bray, *Equity Will Not. . .* , INTERSTITIAL PRIVATE LAW 10 (Samuel L. Bray et al. eds., 2024).

But part of DKH's requested relief goes well beyond the scope of "preserv[ing] the status quo." *Robinson,* 957 at 1178–79 (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors*, 896 F.2d at 1284). DKH seeks not only to prohibit the defendants from using or disclosing the software and database, but to "restore" the software and database to DKH—essentially specific performance. MPI at 1. Stated more simply, DKH wants an order requiring the defendants to turn over the software and database, *i.e.*, the trade secrets. If the defendants ultimately prevail in this litigation, that kind of preliminary relief would effectively deprive the defendants of their property for months, maybe years. Worse, assuming their narrative is accurate, the defendants would have been compelled to disclose their trade secrets to a competitor, a harm that could not easily (if at all) be undone later. DKH does not explain why this kind of relief comports with the scope of a preliminary injunction as exercised by the High Court of Chancery in England in 1789, nor does DKH identify a historical analogue.

6

A more modest remedy might have been warranted had DKH established a substantial likelihood of success on the merits. For example, the current temporary injunction prohibits the "disclosure, sale, or other transfer of the software and database" and requires the defendants to preserve the software and database on a secure third-party server, which sufficiently freezes the parties' relative positions. Temp. Inj. (Doc. 27) at 1–2. That kind of equitable remedy maintains the status quo without itself imposing irreparable harm on another party.

In sum, to "restore" the software and database effectively deems DKH the victor, well before "the merits of the controversy can be fully and fairly adjudicated." *Robinson*, 957 at 1178–79 (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors*, 896 F.2d at 1284). The relief threatens substantial injury to the opposing party without a clear reason why the movant's harm outweighs that kind of damage. *See Siegel*, 234 F.3d at 1176. And even had DKH shown entitlement to some injunctive relief, the transfer of trade secrets is "too extreme a response." *Dep't of State v. AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 757 (2025) (Alito, J., dissenting from the denial of the application to vacate order).

### B. DKH has Failed to Show a Substantial Likelihood of Success on the Merits

The movant for a preliminary injunction must "clearly establish[]"that there is a substantial likelihood of success on the merits of their claims. *All Care Nursing Serv., Inc.*, 887 F.2d at 1537 (quotation omitted). Absent that showing, a court may not exercise its equitable powers to grant preliminary relief. "Generally . . . a judge should not resolve a

7

factual dispute on affidavits or depositions, for then he is merely showing a preference for one piece of paper to another." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998) (quotations omitted). Further, highly disputed factual issues may cast doubt on the plaintiff's substantial likelihood of success. *See* 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2948.3 (3d ed. Sept. 2024 update) ("In many cases the existence of a factual conflict, or of difficult questions of law, may create sufficient doubt about the probability of plaintiff's success to justify denying a preliminary injunction.").

DKH has failed to show the substantial likelihood of success on the merits of its conversion and misappropriation of trade secrets claims. MPI at 10-14. To plead a conversion claim, a plaintiff must allege sufficient facts to "establish that he was in possession of the goods, or entitled to possession, at the time of the conversion." *Nat'l Ventures, Inc. v. Water Glades 300 Condo. Ass'n*, 847 So. 2d 1070, 1073 (Fla. 4th DCA 2003) (citing W. PAGE KEETON, ET AL., PROSSER AND KEETON ON TORTS, § 15, 102–03 (5th ed. 1984)); *see Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011). Under the Defend Trade Secrets Act, the plaintiff must allege facts showing that he is the "owner" of the trade secrets, which is defined as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." 18 U.S.C. § 1839(4); *see Highland Consulting Grp., Inc. v. Minjares*, 74 F.4th 1352, 1358 (11th Cir.

2023) (explaining the requisite evidence to show ownership). DKH submitted no contract evidencing ownership. As Brooksher points out, the "threshold issue" of ownership was not addressed at all in DKH's motion, Resp. to MPI (Doc. 48) at 13, and neither was possession, *id.* at 16.

To compound this problem, the parties asked the Court to rule on the motion based solely on the written submissions. *See* (Doc. 54). But many factual disputes remain between the warring declarations filed by Kimball and Brooksher, and I may not make credibility determinations based on paper submissions as to who created, and thus owned or possessed, the disputed software and database (the alleged trade secrets). *See* Am. Compl. ¶ 18 ("DHK was the equitable owner of the software, having paid for the development."). *Compare* Kimball Decl. ¶¶ 8–10 (explaining that Brooksher only initially consulted on the software and it was always housed on the software repository that Kimball, and later DKH, owned), *with* Brooksher Decl. ¶¶ 15, 31 (asserting that Brooksher alone created the software at issue on his personal computer where only he could access it). While DKH asserts that there is only one software at issue, Kimball Decl. ¶ 9–11, Brooksher contends that there are two software applications with different capabilities. Brooksher Decl. ¶ 16. According to Brooksher, he developed an application on his personal server that had robust features such as online food ordering. *Id.* Developers hired by Kimball wrote the other software on Kimball's server, which had limited capabilities, such as aggregating food

9

delivery data, and no database. *Id.* Brooksher contends that Kimball still has access to the software developed on Kimball's servers, and DKH can therefore continue developing the software. *Id.* ¶¶ 36–37. Brooksher claims he offered to license the application to DKH, but DKH and Kimball have neither accepted nor declined the offer. *Id.* ¶ 40.

As a result of the significant factual disputes about who owns what, DKH has not carried its burden to clearly establish a substantial likelihood of success on its claims. *See All Care Nursing Serv., Inc.*, 887 F.2d at 1537; *McDonald's Corp.*, 147 F.3d at 1312–13.

## IV. CONCLUSION

Because DKH has not shown a substantial likelihood of success on the merits, its Motion for a Preliminary Injunction (Doc. 12) is **DENIED**. In the light of the denial of this motion, the Stipulated Temporary Injunction (Doc. 27) is **DISSOLVED**.

**ORDERED** in Tampa, Florida, on March 24, 2025.

Kathryn Kimball Mizelle
United States District Judge

10