## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DELIVERY KICK HOLDINGS, INC.,

     Plaintiff,

v.                             Case No. 8:24-cv-1506-KKM-NHA

RJ BROOKSHER LLC, and RILEY
BROOKSHER,

     Defendants.

_____

### ORDER

Defendants RJ Brooksher, LLC (RJB), and RJ Brooksher (an individual and the sole member of RJ Brooksher, LLC) move to dismiss three counts in plaintiff Delivery Kick Holdings, Inc., (DKH)'s second amended complaint. *See* Motion to Dismiss (MTD) (Doc. 66); 2d Am. Compl. (Doc. 58). DKH opposes. Resp. (Doc. 70). For the reasons below, I grant the motion in part and deny it in part.

### I.    BACKGROUND

DKH is a Florida corporation formed by Nicolas Kimball and Brooksher "to develop and host a mobile food delivery application." 2d Am. Compl. ¶¶ 1, 7. Before forming DKH, Kimball hired contractors to develop prototype software that "scrape[d]" data from the Internet and assembled it in a database to be used with the food delivery application. *Id.* ¶ 7. The "software

development and database" were stored on secure, password-protected repositories owned by Kimball. *Id.* ¶¶ 7–11, 15. In December 2022, Kimball hired Brooksher to consult on the development of the Delivery Kick Application, to be paid by the hour. *Id.* ¶¶ 8–9. Specifically, Brooksher, through his company RJB, "agreed to perform consulting services, including reviewing code written by other contractors, debugging code, and configuring databases owned by Kimball." *Id.* ¶ 9. In 2023, Brooksher began testing and assembling code for the prototype software and configuring cloud storage, but Brooksher did not author either the software or related database. *Id.* ¶¶ 13, 16–17; *see* Ex. A (Doc. 58-1) (compiling Brooksher's submitted timesheets).

Subsequently, "Kimball offered Brooksher an ownership interest in a new entity, DKH, that was to be formed" with the "sole goal" of continuing "to develop a food delivery application (and associated website), Delivery Kick, which would charge a fee for functionality such as online ordering, delivery tracking, and result filtering." *Id.* ¶ 19. Kimball would provide the capital and own 75% of the company, while Brooksher would own the other 25% and invoice DKH at half his previous rate. *See id.* ¶ 20. Kimball assigned "all of the software and data already developed . . . []to DKH." *Id.* Although Kimball and Brooksher prepared a formal operating agreement for DKH, neither individual executed it "[d]ue to technical issues." *Id.* ¶¶ 20–21. From then on, Brooksher "held himself out at as the Chief Technical Officer ('CTO') of DKH," listing that

title in his email and signing two contracts on DKH's behalf. *Id*. ¶ 22. "In that capacity, Brooksher had access to DKH's data, its database, its software, its servers, all of which were proprietary to DKH and which were maintained in secrecy." *Id*. ¶ 22. Despite Brooksher's access, "DKH was the equitable owner of the software" and "became the owner by assignment from Kimball." *Id*. ¶ 24. On December 5, 2023, Kimball registered the website for DKH. *Id*. ¶ 25.

Starting around May 2024, "Brooksher started deleting source code, data and the database associated with the Delivery Kick application from DKH's servers," as DKH was preparing to launch the application. *Id*. ¶¶ 26–27. In late May, "[w]hile continuing to act as DKH's CTO, and without disclosing his actions at the time," Brooksher applied to copyright the "RJ Brooksher LLC Food Delivery Application," which he claimed to have authored. *Id*. ¶ 30. Brooksher then terminated his relationship with DKH and asserted that he owned the food delivery application. *Id*. ¶ 31. DKH sued, and after being permitted to "amend its complaint one more time," (Doc. 57) at 13, filed its second amended complaint, alleging violations of the Defend Trade Secrets Act (DTSA), 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act (FUTSA), §§ 688.001–688.009, Florida Statutes, as well as breach of contract, civil conversion, fraud, and breach of fiduciary duty claims under Florida law. 2d Am. Compl. ¶¶ 32–83.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This pleading standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"To survive a motion to dismiss" under Rule 12(b)(6), a plaintiff must plead sufficient facts to state a claim "that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when a "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The complaint's factual allegations are accepted "as true" and construed "in the light most favorable to the plaintiff." *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

## III.    ANALYSIS

The defendants move to dismiss DKH's claims for breach of contract, civil conversion, and fraud. I address each in turn.

## A. Count III: Breach of Contract

Defendants Brooksher and RJB contend that DKH fails to state a breach of contract claim because it does not allege the existence of a valid oral agreement, arguing that "[t]he mutual obligations are not pled or identified, nor is the tender of consideration." MTD at 3. DKH responds that the defendants "ignore[] allegations that address these elements directly." Resp. at 3. I agree that DKH alleges the elements of a breach of contract.

To state a claim for breach of contract in Florida, a plaintiff must allege "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). On the first element, "[a]n oral contract . . . is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004); *see also Rubenstein v. Primedica Healthcare, Inc.*, 755 So. 2d 746, 748 (Fla. 4th DCA 2000) ("[A] plaintiff is required to allege facts that . . . demonstrate that the parties mutually assented to a certain and definite proposition and left no essential terms open." (citation modified)). "What constitutes an 'essential term' in an agreement may vary depending upon the nature of the contemplated transaction or agreement and is evaluated on a case-by-case basis." *Dozier v. Scruggs*, 380 So. 3d 505, 509 (Fla. 5th DCA 2024).

The defendants do little to explain their position that DKH failed to plead mutuality of obligation or essential contract terms, and I do not see the purported deficiencies. DKH alleges that "Brooksher entered an oral contract for IT consulting with DKH, for which services were billed through RJB," and that Brooksher, "[i]n recognition of the contract between the parties," submitted invoices to be paid for his work at an agreed-upon hourly rate. 2d Am. Compl. ¶¶ 20, 54–57. The specific terms of Brooksher's work derived from his previous agreement with Kimball, in which Brooksher "agreed to perform consulting services." *Id.* ¶ 9; *see id.* ¶ 17 (describing "the various deliverables [Brooksher] provided in exchange for payment"). Once DKH was formed with the "sole goal" of building a food delivery application, Brooksher "agreed to continue work for DKH" at a decreased hourly rate (in exchange for an equity stake), *see id.* ¶¶ 19–20, and "acknowledged he was being paid to configure, test, and finalize the database structure of DKH's database, to configure and optimize DKH's sql server, to set up and configure all AWS services," *id.* ¶ 28; *see generally* Ex. A (detailing Brooksher's work). DKH plausibly alleges the parties' bargained-for obligations: Brooksher was to perform services, and DKH was to pay for those services by the hour and in equity. Those mutual obligations, even if agreed to orally, are sufficient consideration to support a contract. *See, e.g., Cintas Corp. No. 2 v. Schwalier*, 901 So.2d 307, 309 (Fla. 3d

DCA 2005) ("A promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do.").

DKH also alleges the remaining elements for a breach of contract claim. Although DKH timely paid Brooksher's invoices, "Brooksher withheld the deliverables associated with certain services he bill[ed]" and "secretly began deleting software and data of DKH" that he agreed to configure. *Id.* ¶ 58. Because "the essence of the contract" was for Brooksher to develop DKH's application, which Brooksher "understood DKH . . . owne[d]," DKH sufficiently pleads a "vital or material breach" of the contract. *Marchisio v. Carrington Mortg. Servs.*, LLC, 919 F.3d 1288, 1313 (11th Cir. 2019); 2d Am. Compl. ¶ 24. On damages, Brooksher's breach "deprived DKH of the benefits owed under the contract, and had numerous significant and predictable consequences, including the elimination of the functionality of the Delivery Kick Application, website and database, and the loss of access to DKH's data," which in turn prevented the application's launch. *Id.* ¶ 59. Accordingly, DKH states a breach of contract claim against Brooksher.[1]

---

[1] DKH also requests "[a]n Order finding Defendants liable for breach of the contract with DKH." 2d Am. Compl. at 15 (Prayer for Relief). But, as the defendants correctly note, DKH only fairly alleges that "Brooksher entered an oral contract for IT consulting with DKH, for which services were billed through RJB." *Id.* ¶ 54. Because the lone reference to RJB does not fairly allege RJB's assumption of Brooksher's obligations, I construe this claim as only against Brooksher individually.

### B. Count IV: Conversion

In its civil conversion claim, DKH alleges that it "has the absolute right to possession of an operable copy of the database (and associated data), software and source code associated with the Delivery Kick Application, servers and website, as well as scraping data and market documentation," and that the defendants "wrongfully . . . assumed control over" those items. 2d Am. Compl. ¶¶ 64–66. Similar, albeit narrower allegations in DKH's earlier complaint sufficed to state a claim, but I explained that "the Copyright Act may preempt [the conversion claim] and the FUTSA may displace it." (Doc. 57) at 11. The defendants now raise these two preemption arguments and attack DKH's expanded ownership claim over "publicly available data pulled from third party websites" as "not plausible." *See* MTD at 4–9. DKH responds that copyright protection depends on "originality and functionality issues to be analyzed in discovery," and, regarding "scraped" data, that "copyrightability does not extend to information in the public domain." Resp. at 5.

#### i. Copyright Act Preemption

At this stage, I cannot conclude that the Copyright Act preempts DKH's claim. The Copyright Act preempts "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as

specified by sections 102 and 103." 17 U.S.C. § 301(a). "[T]his language sets up a two-part test for determining when a state-law claim is preempted" by federal copyright law. *Dunlap v. G&L Holding Grp.*, 381 F.3d 1285, 1293 (11th Cir. 2004). First, courts "must decide whether the rights at issue fall within the 'subject matter of copyright' set forth in sections 102 and 103; and second, [courts] must determine whether the rights at issue are 'equivalent to' the exclusive rights of section 106." *Id.* at 1293–94 (citation modified) (quoting *Crow v. Wainwright*, 720 F.2d 1224, 1225–26 (11th Cir. 1983)). "[T]he subject matter of copyright, in terms of preemption, includes only those elements that are substantively qualified for copyright protection." *Id.* at 1295. On the second prong, "if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display . . . then the right does not lie within the general scope of copyright and there is no preemption." *Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001).

First, for preemption to apply, "it is necessary that the claim involve a work that is *substantively eligible* for copyright protection." *Dunlap*, 381 F.3d at 1296 (emphasis added). Federal copyright law protects certain computer code and programs as "original works of authorship fixed in [a] tangible medium of expression . . . from which they can be perceived . . . either directly or with the aid of a machine or device." 17 U.S.C. § 102(a); *Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, LLC*, 199 F. Supp. 2d 1271, 1289 (M.D.

Fla. 2001) ("[T]he literal elements of computer programs—their source and object codes—are subject to copyright protection."); *MiTek Holdings, Inc. v. Arce Eng'g Co.*, 864 F. Supp. 1568 (S.D. Fla. 1994), *aff'd*, 89 F.3d 1548 (11th Cir. 1996) (protecting " 'nonliteral' elements, such as the program architecture, structure, sequence, organization and computer-user interface"). "For original computer programs . . . copyright automatically inheres in the work at the moment it is created without regard to whether it is ever registered." *Montgomery v. Noga*, 168 F.3d 1282, 1288 (11th Cir. 1999). On the other hand, not all individual components of a computer program receive protection. For example, "material taken from the public domain is unprotected, even if incorporated into a copyrighted work." *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1303 (11th Cir. 2020). Likewise, "obvious label[s] . . . lack the requisite originality for copyright protection." *Compulife Software Inc. v. Newman*, 111 F.4th 1147, 1159 (11th Cir. 2024), *cert. denied sub nom.*, *Rutstein v. Compulife Software, Inc.*, 145 S. Ct. 1172 (2025) (quoting *BellSouth Advert. & Pub. Corp. v. Donnelley Info. Pub., Inc.*, 999 F.2d 1436, 1444 (11th Cir. 1993) (en banc)).

Here, DKH's allegations suggest that certain components of the Delivery Kick Application lack copyright protection and so do not "fall within the 'subject matter of copyright' set forth in sections 102 and 103." *Dunlap*, 381 F.3d at 1293. At the core of its claim, DKH asserts an "absolute right to

possession of an operable copy of the database (and associated data), software and source code associated with the Delivery Kick Application, servers and website, as well as scraping data and market documentation." 2d Am. Compl. ¶ 64. The "scraping data," for example, is likely not subject to protection because "[s]craping is a technique for extracting large amounts of data from a website," some of which might be in the public domain.[2] *See Compulife*, 959 F.3d at 1299. Even the defendants concede that data allegedly scraped from third party websites is "by definition . . . publicly available data." MTD at 4; *see* 2d Am. Compl. ¶ 7 ("The first software was used to 'scrape' data from the Internet and assemble it in a database to be used with the Delivery Kick Application."). The complaint also lacks enough information regarding the application's "user interface" to assess copyrightability. *See, e.g.*, *MiTek*, 864 F. Supp. at 1583 (finding that "the use of a four-box, screen display is part of the public domain . . . [and] is not entitled to copyright protection"). On these alleged facts, and without knowing more about how "scraped data" is integrated into the Delivery Kick Application, I cannot discern whether DKH's conversion claim satisfies the first prong of copyright preemption.

---

[2] For this reason, I am skeptical that DKH has a sufficient property interest in this data for it to support a conversion claim. *See United States v. Bailey*, 419 F.3d 1208, 1214 (11th Cir. 2005) (explaining that for conversion, "the plaintiff must have a present or immediate right of possession of the property in question." (quoting *Page v. Matthews*, 386 So.2d 815, 816 (Fla. 5th DCA 1980)).

Second, even assuming the first prong, the possessory rights at stake in DKH's conversion claim are not equivalent to DKH's rights under section 106, which gives a copyright owner "exclusive rights" of reproduction, adaptation, publication, performance, and display. 17 U.S.C. § 106. Here, DKH alleges that "Brooksher started deleting source code, data and the database associated with the Delivery Kick Application from DKH's servers," "assumed control over an operable copy" of the application, and then filed his own copyright application. 2d Am. Compl. ¶¶ 27–31, 66. In doing so, Brooksher "remov[ed] . . . data in DKH servers and cloud storage" and, by logical inference, must have "reproduce[d]," "display[ed]," or "prepare[d] derivative works based upon [it]" for his own copyright application. *Id.* ¶ 64; 17 U.S.C. § 106(1), (2), and (5).

While that reproduction alone suffices to violate DKH's "exclusive rights" under § 106, *see* 17 U.S.C. § 501(a), conversion requires an "extra element," namely the taking of chattels with "intent to exercise ownership over them . . . inconsistent with the real owner's right of possession." *Foley*, 249 F.3d at 1285; *Hannah v. Malk Holdings, LLC*, 368 So. 3d 1087, 1091 (Fla. 6th DCA 2023). For this reason, courts have recognized that "[c]opyright infringement will not form the basis of a conversion claim because copying a plaintiff's work amounts to an invasion of an intangible property right but fails to deprive the plaintiff of his property." *Santilli v. Cardone*, No. 807-CV-308-T-23MSS, 2008 WL 2790242, at *5 (M.D. Fla. July 18, 2008) (citing *Local*

*Trademarks v. Price*, 170 F.2d 715, 718–19 (5th Cir. 1948)). Because conversion requires DKH's allegation that Brooksher removed—not just copied—the food delivery application, whereas copyright interference does not, the Copyright Act does not preempt the conversion claim.

### ii. FUTSA Displacement

Although I am not convinced that the Copyright Act preempts the conversion claim, the defendants also maintain that DKH's conversion claim is displaced by the FUTSA. *See* MTD at 7–9. DKH does not respond to this argument and has thus abandoned any claim to the contrary. *See, e.g.*, *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (holding that a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned). Even considering the issue, I agree that the FUTSA forecloses DKH's conversion claim.[3]

While Florida law might permit a conversion claim "for the wrongful use of information not rising to the level of trade secrets" in "certain circumstances," *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1297 (11th Cir. 2003), the FUTSA displaces such claims when the underlying wrong is based on trade secret misappropriation alone, *see* § 688.008, Fla. Stat.

---

[3] In a previous order, I explained that the "the Copyright Act does not preempt the FUTSA claim" under the "extra element test." (Doc. 57) at 8–9.

("displac[ing] conflicting tort" law); *see also New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d 893, 908 (M.D. Fla. 2007). The scope of preemption turns in part on the nature of the intangible property, which is often "a question of fact." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001). At this stage, DKH's well-pleaded allegations resolve that factual question. DKH contends that it "invested significant time and resources into developing the software and data for the Delivery Kick Application, website and database, as well as the configuration and assembly of the database and servers (collectively the 'Trade Secrets')." 2d Am. Compl. ¶ 33, 44. In the FUTSA claim, DKH then alleges that "Brooksher misappropriated the Trade Secrets by copying and stealing them, destroying the copies of DKH, then disclosing and transferring the Trade Secrets to RJ Brooksher LLC." *Id.* ¶ 49.

DKH's conversion claim simply repackages its misappropriation claim by alleging that "[t]he Defendants wrongfully took (sic) assumed control over an operable copy of the data, database, software and source code associated with the Delivery Kick Application, and destroyed DKH's copy thereof, as well as the backup images." *Id.* ¶ 66. Because DKH does not offer any "material distinction[] between the allegations comprising the [conversion claim] and the allegations supporting the FUTSA claim," *Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553–54 (Fla. 3d DCA 2020) (quoting *New Lenox*, 510 F.

14

Supp. 2d at 908), the FUTSA "displace[s] it" entirely, § 688.008, Fla. Stat. Count IV is therefore dismissed.

### C. Count V: Fraud

I dismissed DKH's fraud claim in its earlier complaint because DKH did not alert the defendants to specific statements or omissions constituting fraud, causing its allegations to "fall far short of the heightened pleading standard under Rule 9(b)" (Doc. 57) at 12. Although DKH's second amended complaint includes additional details regarding Brooksher's statements and omissions, these allegations again fail to satisfy Rule 9(b)'s particularity requirements. In the alternative, DKH's allegations either fail to state a claim or are displaced by the FUTSA claim.

To state a claim for fraud, DKH must allege: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (per curiam) (quotations and emphasis omitted). In addition to affirmative representations, "[a] defendant's knowing concealment or nondisclosure of a material fact may also support an action for fraud where there is a duty to disclose." *Gutter v. Wunker*, 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994) (per curiam). In either case, fraud "must concern a past or existing fact in order to be actionable." *Thor*

15

*Bear, Inc. v. Crocker Mizner Park, Inc.*, 648 So. 2d 168, 172 (Fla. 4th DCA 1994) (per curiam).

On top of these elements, Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This rule "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged." *Durham v. Bus. Mgmt. Assocs.*, 847 F.2d 1505, 1511 (11th Cir. 1988) (citation modified). To that end, a complaint must detail: "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud." *In re Galectin Therapeutics, Inc. Secs. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016).

Again, DKH's fraud allegations fall below Rule 9(b)'s heightened pleading standard. The second amended complaint alleges that Brooksher defrauded DKH through "a series of false statements and material omissions of fact," and, "[i]n particular, Brooksher misrepresented his role in DKH and his desire to assist in the launch of the Delivery Kick Application and website in order to receive access to the resources, data, servers, cloud storage, software and source code of DKH." 2d Am. Compl. ¶ 69. According to DKH, Brooksher

"held himself out as" DKH's CTO, "falsely suggested he was interested in assisting in testing and developing the Delivery Kick Application," "did not disclose his own self-dealing and efforts to copyright software paid for by DKH and previously integrated into DKH's servers," and "did not disclose his efforts to destroy all DKH data, databases, website and application." *Id.* ¶¶ 69–70.

While these allegations describe Brooksher's general pattern of conduct, they do not identify specific statements or omissions, much less the time or place of their making. As for timing, DKH claims that the statements and omissions were first made "[i]n connection with hiring Brooksher," which presumably relates to when Kimball offered "Brooksher an ownership interest in a new entity, DKH" at some point in 2023. 2d Am. Compl. ¶¶ 16, 19, 21, 69. That is insufficient to give Brooksher fair notice. DKH's allegations are substantively vague, too. For example, DKH says Brooksher "misrepresented . . . his desire to assist in the launch of the Delivery Kick Application and website" and "falsely suggested he was interested in . . . rendering [the application] operable." *Id.* ¶ 69. But DKH does not explain what Brooksher said or did to manifest this false "desire" or interest. Again, that lack of specificity fails to supply Brooksher fair notice to contest the claim.

Even if Brooksher's statements were well-pleaded, they fail to state a claim for fraud. To start, DKH says that Brooksher "misrepresented his role in

DKH and his desire to assist in the launch of the Delivery Kick Application," including by "sign[ing] documents as the CTO of DKH and h[olding] himself out as such." *Id.* But DKH never alleges that Brooksher's representations regarding his position or title were untrue. In fact, albeit in a separate count, DKH says that Brooksher "was a Director and the CTO of DKH from August 1, 2023 until his resignation on June 10, 2024." *Id.* ¶ 76; *see also id.* ¶ 22 (explaining that in Brooksher's role as CTO, he "made statements and performed actions on behalf of DKH"). Because DKH's complaint lacks any suggestion that Brooksher did not serve as DKH's CTO, or that he did not believe as much, Brooksher's external statements do not constitute fraud.

Next, DKH levels allegations regarding Brooksher's expressed "interest," claiming that he "misrepresented . . . his desire to assist" in DKH's application development with nefarious intent "to steal the data, database, software and source code, and render them inoperable for DKH." *Id.* ¶ 69. To be sure, Florida courts have held that "[a] promise as to future conduct may serve as a predicate for a claim of fraud if it is made without any intention of performing, or with the positive intention not to perform." *See, e.g.*, *Palmer v. Santa Fe Healthcare Sys., Inc.*, 582 So. 2d 1234, 1236 (Fla. 1st DCA 1991); *but see King v. Bencie*, 752 F. App'x 881, 884 (11th Cir. 2018) (per curiam) ("[A] mere promise not performed . . . without more, cannot form the basis of actionable fraud under Florida law." (citation modified)). DKH's claims

18

regarding Brooksher's intentions, as pleaded, do not allege the specific promises that Brooksher made "with the positive intention not to perform."[4] *Palmer*, 582 So.2d at 1236. Absent that nexus, Brooksher's free-floating representations do not "concern[] a material fact," and so cannot constitute fraud. *Butler*, 44 So. 3d at 105.

As for DKH's allegations that "Brooksher did not disclose his own self-dealing and efforts to copyright software paid for by DKH," 2d Am. Compl. ¶ 70, those facts are subsumed within—and displaced by—DKH's FUTSA claim. On this score, the defendants argue that DKH's "fraud count is preempted by FUTSA because it relies on allegations that are not materially different from the allegations underlying the FUTSA count." MTD at 13. Generally, where "the allegations of trade secret misappropriation *alone* comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss." *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1181 (M.D. Fla. 2005); *New Lenox*, 510 F. Supp. 2d at 908. But

---

[4] To the extent that DKH implies Brooksher fraudulently billed "more than $80,000 in fees," DKH does not allege which specific services Brooksher lied about performing. 2d Am. Compl. ¶ 69. Even so, that fraud is part and parcel to performance of Brooksher's contractual obligations and merely duplicates DKH's breach of contract damages. *See Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. 3d DCA 2017) ("[F]or an alleged misrepresentation regarding a contract to be actionable, the damages stemming from that misrepresentation must be independent, separate and distinct from the damages sustained from the contract's breach."); *see also Ghodrati v. Miami Paneling Corp.*, 770 So. 2d 181, 183 (Fla. 3d DCA 2000) ("A plaintiff, however, may not recover damages for fraud that duplicate damages awarded for breach of contract.").

if "there are 'material distinctions between the allegations comprising the [fraud] and the allegations supporting the FUTSA claim,' " the fraud claim may proceed. *Digiport, Inc. v. Foram Dev. BFC, LLC*, 314 So. 3d 550, 553–54 (Fla. 3d DCA 2020) (per curiam) (quoting *New Lenox*, 510 F. Supp. 2d at 908).

In response, DKH argues that although the allegations are similar, one distinction precludes displacement. Resp. at 7. According to DKH, "[Brooksher's] fraud is what led to Brooksher having access to the trade secret information" in the first place, whereas the FUTSA claim relies on Brooksher's eventual destruction and theft of those trade secrets. *See id.; see also New Lenox*, 510 Supp. at 908 (differentiating between fraud "to obtain access to Plaintiff's confidential proprietary information" and the eventual "disclos[ure] [of] the unlawfully obtained trade secrets to others in the . . . industry"). DKH reads its own allegations too narrowly.

As alleged, Brooksher's failure to disclose "his own self-dealing," "efforts to build his own, competing business," and "efforts to destroy all DKH data, databases, website and application" did not occur until he already had access to DKH's systems. 2d Am. Compl. ¶ 70. Those omissions "allowed Brooksher time to access and remove content and materials from DKH's cloud storage." *Id.* Of course, Brooksher could not have "remove[d] content" to which he did not already have access. Viewed this way, the balance of DKH's fraud claim is a carbon copy of its FUTSA claim, which contends that Brooksher "[t]hrough

20

fraud and deceit, . . . received access to the Trade Secrets, stole copies of them, [and] then destroyed DKH's copies of the Trade Secrets." *Id.* ¶ 48. Because there are no "material variations" between the claims, the FUTSA displaces DKH's fraud claim. *Digiport*, 314 So. 3d at 553–54. Count V is dismissed.

## IV.    CONCLUSION

Accordingly, the following is **ORDERED**:

1.    Defendants' Motion to Dismiss (Doc. 66) is **GRANTED IN PART and DENIED IN PART.**

2.    Counts IV and V of the Second Amended Complaint (Doc. 58) are **DISMISSED with prejudice.** The action shall proceed on Plaintiff's remaining claims in Counts I, II, III, and VI. The defendants must file a response to those claims no later than **January 14, 2026.**

**ORDERED** in Tampa, Florida, December 31, 2025.

*Kathryn Kimball Mizelle*

Kathryn Kimball Mizelle
United States District Judge