**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DELIVERY KICK
HOLDINGS, INC.,

Plaintiff,

v. Case No. 8:24-cv-1506-KKM-NHA

RJ BROOKSHER LLC,
and RILEY BROOKSHER,

Defendants.
___________________________________

**ORDER**

Delivery Kick Holdings, Inc., (DKH) sues RJ Brooksher LLC (RJB) and Riley Brooksher for breach of contract, breach of fiduciary duty, and misappropriation of trade secrets related to the parties' development of a food delivery application. *See* 2d Am. Compl. (Doc. 58). DKH moves for partial summary judgment, DKH MSJ (Doc. 132), and to exclude or limit the opinions of the defendants' software expert, DKH *Daubert* Mot. (Doc. 133). The defendants move for summary judgment on all claims and on DKH's request for damages, RJB MSJ (Doc. 136), and to exclude or limit the testimony of DKH's software expert, RJB *Daubert* Mot. (Doc. 138). For the below reasons, I grant in part and deny in part DKH's motion for partial summary judgment, deny DKH's *Daubert* motion, and grant in part and deny in part the defendants' motion for summary judgment and *Daubert* motion.

# I. BACKGROUND

## A. Business Relationship

Nicolas Kimball is a restaurant owner and operator. *See* Kimball Decl. (Doc. 134-1) ¶ 3. In late 2022, Kimball "began the project for Grubermates," later renamed Delivery Kick, a "centralized space where customers could view all their options (Grubhub, Uber, Postmates, etc.) in one place, ensuring faster results, higher quality product, and less stress on the restaurant operator." *Id.* ¶¶ 3–4. Kimball hired programmers through a company called Mindbowser and "commissioned them to develop . . . scrapers, which are automated programs that collect defined data fields from multiple third-party websites." *Id.* ¶ 4; Joint Statement of Undisputed Facts (JSUF) (Doc. 131) ¶ 5. "The Mindbowser team also developed the backend processing and management software to be used with an application program interface ('API') to be used by end users to search for food based on zip code." Kimball Decl. ¶ 5. In December 2022, "Kimball registered the domain name deliverykick.com," JSUF ¶ 4, "with the expectation that a company would ultimately be formed to monetize the Delivery Kick project," Kimball Decl. ¶ 6.

That same month, Kimball met Riley Brooksher, "a computer programmer and software developer" who "provides computer programming, software development and other IT services to third parties for a fee" through his company, RJ Brooksher LLC (RJB). JSUF ¶¶ 2–3. According to Kimball,

he "asked Brooksher to . . . consult on the Delivery Kick project, which initially involved setting security permissions and bug testing the software being developed by Mindbowser," and "contracted with Brooksher . . . to manage and secure the data and code from [the] third-party developers [whom Kimball] had already engaged." Kimball Decl. ¶ 8. Although "[t]he contractual relationship with Brooksher began prior to the formation of DKH," Kimball maintains that it "was for the benefit of DKH," to which he eventually "assigned the contract." *Id.* ¶ 9. "Under the consulting contract," which could be terminated at any time, "Brooksher and his company regularly prepared and submitted invoices detailing the tasks he performed." *Id.* ¶ 10. Invoices were paid by Kimball but listed the "DeliveryKick" project. *Id.*; *see* (Doc. 59-1).

In April 2023, Kimball proposed forming DKH with Brooksher, and the two "agreed on the formation of DKH with each of us [as] directors[,] and documents were prepared to form DKH." Kimball Decl. ¶ 13. In this "handshake deal," Kimball and Brooksher "agreed that [Kimball] would own 75% of DKH because [Kimball] was funding the startup and operation, and after two years Brooksher's 25% interest would vest," in exchange for Brooksher reducing his hourly consulting rate by half. *See* Kimball Decl. in Supp. of Prelim. Inj. (Doc. 12-1) ¶ 14; Kimball Dep. (Doc. 137-18) 47:7–59:5, 206:10–208:20.

In Brooksher's telling, he and Kimball "agreed that [Brooksher] would continue to provide [his] services but at half [his] rate in exchange for an ownership interest in a company," to vest in two years. Brooksher Decl. (Doc. 137-1) ¶¶ 29–33. Slack messages between Kimball and Brooksher in April 2023 indicate that they discussed a 2-year incremental vesting period. (Doc. 137-11) at 4. Although Kimball describes those discussions as "prenegotiations to setting the stage for forming the entity," Kimball later testified that "[t]here was an agreed vesting period that [Brooksher] agreed to cut [Brooksher's] rate." Kimball Dep. 55:4–8, 17–18; *see id.* 207:24–208:6. Brooksher claims that under the proposed agreement, he "would maintain ownership of [his] originally authored works." Brooksher Decl. ¶ 30.

Later that year, attorney Lori Sandman prepared the documents to incorporate DKH, *see* Kimball Decl. ¶ 13, and Delivery Kick Holdings, Inc., was formed as a Florida Corporation in August 2023 with Kimball and Brooksher listed as directors. JSUF ¶ 1; *see* Brooksher Decl. in Opp. to Prelim. Inj. (Doc. 48-1) ¶ 20; Ex. E (Doc. 144-1) at 89. Around that time, Kimball and Brooksher met in Sandman's office to review and sign a "package" of documents related to the formation of DKH, including bylaws and a "Record of Action Taken by Board of Directors of DK Holdings, Inc., by Unanimous Written Consent." *See* Sandman Dep. (Doc. 137-20) 88:5–10, 204:13, 229:3–19; Ex. E at 97 (listing various DKH formation documents); Written Consent (Doc. 137-5). The bylaws

listed Brooksher as a director and the consent form resolved to appoint Brooksher as a director and issue him equity, "subject to a vesting period of two years." Written Consent at 1; Bylaws (Doc. 137-12). Brooksher did not sign either document. *See* Sandman Dep. 102:3–103:1; Brooksher Decl. ¶¶ 25, 37; Brooksher Decl. in Opp. to Prelim. Inj. (Doc. 48-1) ¶ 18. And the bylaws were never filed. Sandman Dep. 204:16–18. Ultimately, Brooksher claims that he "never authorized Kimball to" list him as a director of DKH, nor was he aware that Kimball had done so or that DKH had been incorporated. Brooksher Decl. in Opp. to Prelim. Inj. ¶ 20; *see* (Doc. 137-19) at 208:2–15; Brooksher Decl. ¶¶ 25–27.

Despite this, Kimball avers that Brooksher "routinely sent emails from his DKH-specific email address, rbrooksher@deliverykick.com, identifying himself as DKH's Chief Technology Officer" (CTO). Kimball Decl. ¶ 14; *see* Ex. E at 90. Brooksher also signed a statement of work with a third-party API provider, Zyte Group, on behalf of DKH, purportedly as its CTO. Ex. E at 91–95. And Brooksher was a signatory to paperwork opening DKH's bank account. *Id.* at 82–84; *see* Brooksher Decl. in Opp. to MSJ (Doc. 146-1) ¶ 11.

**B. Software Development**

As with the nature of their business arrangement, the parties disagree about the substantive development of the Delivery Kick application and the related database.[1]

According to Kimball, "[b]y January 2023, the Mindbowser team had an operable API and user interface, which was running on a server [Kimball] owned at the time." Kimball Decl. ¶ 7. "By February 2023 Brooksher was tasked with setting up a database for integration with the Delivery Kick food delivery application." *Id.* ¶ 16. Kimball wanted the database to include "details on the restaurant[,] hours of operation and location(s), menu items, customizations, etc[.]," *id.*, so he "authorized the creation of an AWS [Amazon Web Services] environment to store the millions of records we were collecting—which included not just restaurant names, but every possible menu item and modification," *id.* ¶ 17. "At all times, this infrastructure and the resulting data were created under [Kimball's] direction and for the benefit of DKH." *Id.*

Although the "AWS account [was] in [Kimball's] personal name," he "tasked Brooksher with configuring an AWS account limited specifically for the Delivery Kick Project and http://deliverykick.com." *Id.* By April 2023,

[1] Notably, DKH includes a fourteen-paragraph "statement of undisputed facts" in its motion for partial summary judgment, the bulk of which relate to development of the Delivery Kick food delivery application. DKH MSJ at 3–6. The defendants dispute nearly every one of these statements. *See* RJB Resp. to MSJ at 9–13.

Brooksher "had configured and migrated a database to the 'DK specific AWS account,' " which continued to accumulate "third-party data . . . scraped in tranches . . . through 2023 and 2024." *Id.* ¶ 20. Kimball "paid approximately $7,734 on behalf of DKH for the AWS infrastructure to run, store, and maintain the system software, database and http://deliverykick.com." *Id*; Kimball Dep. 204:10–11; *see* Brooksher Dep. (Doc. 134-2) at 43:2–9 ("I believe it was Kimball or one of his entities was paying the AWS bills.");[2] *but see* Brooksher Decl. in Opp to MSJ ¶ 4 ("I and Kimball both at times paid for the AWS account, while DKH never did."). Brooksher testified that it was "correct" that "the database in 2023 was in an EC2 instance under a Delivery Kick dot com e-mail address."[3] Brooksher Dep. 44:2–6.

Further, "[a]ccess to the contents of the database was and is password protected," and "[o]ther than Brooksher's access . . . no other individual had or could have accessed the password protected DKH AWS account, nor the DKH

[2] Rather than attaching deposition transcripts, the parties have attached excerpts of deposition transcripts to various filings. The excerpts of the Brooksher Deposition at (Doc. 134-2) are the most complete. Unless otherwise noted, "Brooksher Dep." refers to (Doc. 134-2).

[3] According to the defendants' expert, Donald Waldhalm, EC2 or "Elastic Compute Cloud" "allows users to rent virtual computers (called 'instances') on which they can run their own applications." Waldhalm Report (Doc. 134-4) at 5. Kimball describes the "EC2 instance" as "DKH's virtual server." Kimball Decl. ¶ 28. Brooksher testified that, "[to] give the technical description, I believe AWS [Amazon Web Services] . . . owns the E2 instance itself." Brooksher Dep. 44:17–20.

database." Kimball Decl. ¶ 24; *see* Brooksher Dep. 146:18–147:3 (testifying that Brooksher "was the only individual with access" to the AWS account). Kimball avers that he "discussed confidentiality and security with Brooksher multiple times, including the need to keep the code, database, data, and AWS/server materials protected from public access and from unnecessary third-party access." Kimball Decl. in Opp. to MSJ (Doc. 144-3) ¶¶ 9–10. In Slack messages, Kimball inquired of Brooksher whether they had "any code exposure, trade secrets stuff." *Id.* ¶ 9. In text messages, Brooksher assured Kimball that third parties were "not going to see our code or anything." Ex E. at 74. Thus, Kimball claims that "DKH's software, code, database, data, and AWS/server materials were not public" and "were stored in password-protected repositories, password-protected AWS/server environments, and other restricted systems." Kimball Decl. in Opp. to MSJ ¶ 10.

Brooksher's version of events differs. In his view, in early 2023 "[t]he MindBowser project did not include a database," only "scrapers [that] could scrape [DoorDash, Grubhub, and Ubereats] websites for restaurant data but could not store the data in a functional database." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 8. Kimball also paid for software and source code relevant to the scraping application that was authored by third-party programmers, Wilson Chan and Sumit Dubey. *See id.* ¶ 24, 28 (referencing a GrubHub scraper built by contractor Wilson Chan); Brooksher Decl. ¶ 13 (claiming that contractor

Sumit Dubey, hired through TopTal, "created a mobile application"). Brooksher's "work on the MindBowser Delivery Kick scraping application was limited to setup of AWS permissions, testing and evaluation of new and modified scrapers, as well as management of the consultants' efforts." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 9.

After Brooksher met with Kimball in March 2023, Brooksher "began independently writing software and developing a database for a food delivery service application which RJB would own and would allow our new food delivery company to use." *Id.* ¶ 13. Brooksher then "architected the entirety of the database . . . first creating it on March 25, 2023," Brooksher Decl. ¶ 10, with the expectation that it would be licensed by RJB to the to-be-formed company, *id.* ¶ 34; (137-19) at 28:2–7. Brooksher's database "contains restaurant data, tables for user information, and utility tables." Brooksher Decl. ¶ 4. Brooksher "created the food delivery service software on [his] personal computer," Brooksher Decl. in Opp. to Prelim. Inj. ¶ 15, and "was and [is] the only person with the requisite [Secure Shell (SSH)] keys required to access the EC2 instances the database is and was stored on," Brooksher Decl. ¶ 10. Brooksher represents, however, that "[b]oth Kimball and [he] paid at

times for AWS infrastructure and Oxylabs bandwidth used by [his] system."[4] Brooksher Decl. in Opp. to MSJ ¶ 9.

Brooksher further represents that "Kimball never informed [him] that anything he was doing was a trade secret or should be kept confidential," nor "that he required MindBowser or any of the independent consultants engaged through Toptal to keep anything confidential." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 38; *see* Brooksher Decl. ¶ 36. Although at least one other contractor, Sumit Dubey, signed a work for hire agreement with DKH, (Doc. 137-3), it is undisputed that DKH and the defendants did not execute a written, signed "work for hire or confidentiality agreement." Brooksher Decl. ¶ 36; *see* Brooksher Decl. in Opp. to MSJ ¶ 19–21.

**C. Termination of Business Relationship**

By mid-2024, Brooksher "decided not to proceed with Kimball" because Kimball failed to raise capital or secure customers for Delivery Kick, lost interest in the business, and "rarely provided feedback for the webpage." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 27. "On June 10, 2024, Brooksher notified Kimball that he was discontinuing their business relationship." JSUF ¶ 7; (Doc. 131-2) at 2 ("This letter serves as confirmation that I have

---

[4] "[P]roxy and data-access services from providers such as Zyte and Oxylabs . . . facilitated large-scale data scraping to populate the database in the DKH AWS account." Kimball Decl. ¶ 20. Brooksher signed DKH's agreement with Zyte as DKH's CTO. *See* Ex. E at 91–95.

terminated the business relationship between me and my company . . . and you and your companies . . . .”).

The remaining sequence of events is largely undisputed. “Prior to June 2024 there were multiple AWS EC2 instances associated with rbrooksher@deliverykick.com,” JSUF ¶ 6, an account to which Kimball “was given equivalent admin permissions,” Brooksher Decl. in Opp. to MSJ ¶ 2. Brooksher copied and moved “[t]he database that resided in the AWS EC2 instance associated with rbrooksher@deliverykick.com . . . into the AWS EC2 instance associated with rbrooksher@gmail.com.” JSUF ¶ 8. Brooksher likewise testified that he transferred “[t]he storage volume for the database instance as well as the storage volume for the container deployment instance.” *See* Brooksher Dep. 54:3–23. “In May and June 2024, snapshots associated with the AWS EC2 instances associated with rbrooksher@deliverykick.com were deleted.” JSUF ¶ 9. In that same period, “the AWS EC2 instances associated with rbrooksher@deliverykick.com were stopped/terminated.” *Id.* ¶ 10; *see* (Doc. 131-1) at p. 13, 75:10–19. “In May and June 2024, the AWS S3 buckets associated with rbrooksher@deliverykick.com were deleted.” JSUF ¶ 11. According to Brooksher, he “remove[d] ‘snapshots,’ from the account *i.e.*, backups of AWS EC2 instances of the software that [he] authored that AWS created as [he] was creating the software.” Brooksher Decl. in Opp. to Prelim. Inj. ¶ 32. But Brooksher “did not remove the MindBowser data aggregation

software from Kimball's AWS server and it can still be found today at https://d2vu1oz3e319xu.cloudfront.net/." *Id.*

Around that same time, "RJB obtained a copyright registration for the food delivery software [Brooksher] created." Brooksher Decl. ¶¶ 21, 38(d); (Doc. 137-17). Brooksher avers that he "authored all of the code covered by the registration which is rightfully owned by RJB." Brooksher Decl. ¶ 23; (Docs. 48-4, 48-5); (Doc. 48-3) (showing that "[f]irst 50 pages of software registered with the Copyright Office."). According to Brooksher, "RJB's copyright registration consists of software in the delivery_ui and delivery_backend repositories with the exclusion of scrapers and framework standard code, also known as boilerplate." Brooksher Decl. ¶ 12. Neither Kimball nor DKH obtained copyright in any of the Delivery Kick project's software or source code. *See* Sandman Dep. 143:19–144:4.

**D. Procedural History**

DKH brings claims against Brooksher and RJB for violations of the Defend Trade Secrets Act (DTSA) (Count I), 18 U.S.C. § 1836, and the Florida Uniform Trade Secrets Act, (FUTSA) (Count II), §§ 688.001–688.009, Florida Statutes, as well as state law claims for breach of contract (Count III) and breach of fiduciary duty (Count VI).[5] 2d Am. Compl. ¶¶ 32–83. The defendants

[5] I previously dismissed DKH's claims for civil conversion and fraud. *See* (Doc. 57).

assert affirmative defenses, including copyright preemption and the statute of frauds. *See* Am. Ans. (Doc. 89).

DKH moves for partial summary judgment on its trade secret claims, "specific[ally] [as] to the misappropriation of DKH's trade secret data that is contained in the DKH database," and on the defendants' preemption and statute of frauds affirmative defenses. *See* DKH MSJ at 3; DKH Reply (Doc. 151). DKH also moves to exclude or limit the opinions of the defendants' expert, Donald Waldham. *See* DKH *Daubert* Mot. In turn, the defendants move for summary judgment on all four of DKH's claims and its request for damages, *see* RJB MSJ; RJB Reply (Doc. 152), and to exclude or limit the opinions of DKH's software expert, Mark Fussell, *see* RJB *Daubert* Mot.

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate if no genuine dispute of material fact exists, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A fact is material if it might affect the suit's outcome under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant bears the initial burden of informing the district court of the basis for its motion and identifying those parts of the record that demonstrate a lack of genuine issue of material fact. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). When that burden is met, the burden shifts to

the nonmovant to present evidentiary materials (e.g., affidavits, depositions, exhibits, and so on) demonstrating that there is a genuine issue of material fact, which precludes summary judgment. *Id.* A moving party is entitled to summary judgment if the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

I review the record evidence as identified by the parties and draw all legitimate inferences in the nonmoving party's favor. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1262–63 (11th Cir. 2020). Here, to the extent that the record is disputed or capable of multiple inferences, I draw them for the nonmovant.

**B. Daubert Motion**

Federal Rule of Evidence 702 governs expert testimony, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

FED. R. EVID. 702.

Trial courts must consider if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Thelen v. Somatics, LLC*, 156 F.4th 1115, 1131–32 (11th Cir. 2025) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)). The party seeking to introduce the expert at trial bears the burden of establishing qualification, reliability, and helpfulness. *Frazier*, 387 F.3d at 1260. An expert can be qualified to testify about certain matters based on his scientific training, education, knowledge, or experience in the field. *Id.* at 1260–61.

To determine whether an expert's scientific methodology is reliable, courts consider:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id.* at 1262 (citation omitted). When applicable, these criteria "may be used to evaluate the reliability of non-scientific, experience-based testimony." *See id.* (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Expert testimony generally helps the trier of fact to understand evidence or decide a fact at issue if the testimony "concerns matters that are beyond the understanding of the average lay person." *Id.* Expert testimony generally will not help the trier of fact if it "offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. And, of course, simply because expert testimony meets the *Daubert* standard does not mean that the testimony is automatically admitted. *See id.* at 1263. Courts must still consider whether that testimony satisfies the other Federal Rules of Evidence. *See id.*

## III. ANALYSIS

I begin with the parties' arguments for and against the defendants' entitlement to summary judgment on DKH's breach of contract and fiduciary duty claims before turning to the cross-motions regarding DKH's trade secrets claims. Because the parties' respective software experts primarily address facts relevant to the trade secrets claims, I address the *Daubert* motions there before concluding with the defendants' motion for summary judgment on DKH's request for damages.

### A. Breach of Contract

The defendants move for summary judgment on DKH's breach of contract claim, arguing that "the alleged oral contract between Brooksher and DKH never existed." RJB MSJ at 5. In the alternative, the defendants move for summary judgment on their affirmative defense that DKH's contract claim

is barred by Florida's statute of frauds. *See id.* at 8. DKH opposes and moves for summary judgment on the defendants' statute of frauds and copyright preemption affirmative defenses. *See* DKH MSJ at 16–19. For the below reasons, I grant the defendants' motion with respect to the contract claim.

To succeed on a claim for breach of contract in Florida, a plaintiff must prove "(1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009). "An oral contract . . . is subject to the basic requirements of contract law such as offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). Notwithstanding the enforceability of oral contracts, Florida's statute of frauds requires that any agreement "that is not to be performed within the space of 1 year from the making thereof" must be made in a signed writing. § 725.01, Fla. Stat.

In its amended complaint, DKH alleges that "Brooksher *entered an oral contract* for IT consulting with DKH, for which services were billed through RJB." 2d Am. Compl. ¶ 54 (emphasis added). Brooksher, however, allegedly "withheld the deliverables associate[d] with certain services he bill[ed]" and "secretly began deleting software and data of DKH." *Id.* ¶ 58. Based on the record, the defendants have met their burden of showing that DKH was not a

party to any contract with Brooksher or RJB. In the alternative, the defendants are also entitled to summary judgment on their statute of frauds defense.

**1. DKH is Not a Party to the Contract**

The fundamental problem with DKH's breach of contract claim is that DKH is not a party to the alleged contract with Brooksher and RJB. DKH fails to rebut this conclusion by arguing theories of post-incorporation ratification, third-party beneficiary status, and assignment of rights.

To start, it is undisputed that DKH did not exist when Kimball and Brooksher first met. *See* JSUF ¶¶ 2–4. Nor did DKH exist in April 2023 when Kimball and Brooksher reached a "handshake deal" that "in exchange for 25 percent of the company, [Brooksher] would . . . reduce his rate as his equity." Kimball Dep. 207:19–208:16; *see id.* at 227:9–16. DKH could not be a party to the contract before it existed as a corporate entity. *See* Restatement (Third) of Agency § 6.04, cmt. c (2006) ("If a promoter enters into a contract with a third party on behalf of an entity that has not yet commenced legal existence, the entity itself cannot be a party to the contract prior to its existence.").

DKH likewise fails to identify evidence showing that it ratified the agreement after its incorporation. *See Nat'l Auto Lenders, Inc. v. SysLOCATE, Inc.*, 686 F. Supp. 2d 1318, 1323 (S.D. Fla. 2010) ("Before one may infer that a principal ratified the unauthorized act of his agent, the evidence must demonstrate that the principal was fully informed and that he approved of the

act.") (citation omitted). To be sure, "every invoice" sent by RJB to Kimball from the start of their relationship "identified the Delivery Kick project." DKH Resp. to MSJ at 5 (citing Doc. 67-1). And that practice continued after DKH's incorporation. *See id.* But DKH does not explain how those invoice references, to the extent they evidence Kimball and Brooksher's intent to benefit DKH, demonstrate DKH's "approv[al] of the act," *Nat'l Auto Lenders*, 686 F. 2d at 1323, or place DKH in privity with Kimball. I also fail to see how messages between Kimball and Brooksher discussing " 'our' [needs/ new test training instance/ cloud/ codebase . . . ," *see* DKH Resp. to MSJ at 7, bridge this gap to show that DKH assented to a modification of any agreement.

Next, DKH also fails to provide support for the proposition that DKH is a party merely because "Kimball testified that all work done on the Delivery Kick project from the outset was ultimately for the benefit of DKH." *See id.* at 6. "Although a third-party beneficiary may sue to enforce a contract, that person is not a party to the contract and, therefore, not in privity." *O'Brien v. Wells Fargo Bank, N.A.*, No. 8:25-CV-389-LSG, 2025 WL 3080244, at *2 (M.D. Fla. July 2, 2025). Even if DKH were a third-party beneficiary, *see* DKH Resp. to MSJ at 7, DKH never alleged this separate theory of liability, *see* RJB Reply at 2; *Romika-USA, Inc. v. HSBC Bank USA, N.A.*, 514 F. Supp. 2d 1334, 1341 (S.D. Fla. 2007) ("Florida law draws a distinction between parties to contracts and third-party beneficiaries; the two are mutually exclusive."). "The law is

well-established that a party cannot raise for the first time a new theory of liability in summary judgment briefing." *US Thrillrides, LLC v. Intamin Amusement Rides Int. Corp. Est.*, 767 F. Supp. 3d 1331, 1362 (M.D. Fla. 2025) (citation modified); *Joseph M. Still Burn Centers, Inc. v. Liberty Mut. Ins. Co.*, No. CV 108-090, 2010 WL 55471, at *10 (S.D. Ga. Jan. 6, 2010) (finding that "Plaintiff has raised a new claim by asserting, for the first time on summary judgment, a third party beneficiary claim"). DKH's theory therefore does not preclude awarding summary judgment to the defendants.

In the alternative, DKH contends that it is a party to an agreement with the defendants because Kimball "assigned the contract with Defendants to DKH." DKH Resp. to MSJ at 6. This, too, is a new theory of liability that DKH cannot raise for the first time on summary judgment. *See Cacciamani v. Target Corp.*, 622 F. App'x 800, 804 (11th Cir. 2015) (per curiam) (holding that the plaintiff's "new responsive theory at the summary-judgment stage was too little, too late."). In any event, "an assignment is considered a contract and, as such, requires consideration, or 'cause,' to be valid." *See Pycsa Panama, S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1246 (S.D. Fla. 2008), *aff'd*, 329 F. App'x 257 (11th Cir. 2009) (per curiam). DKH points to no evidence that it provided Kimball adequate consideration, and in fact, even after Kimball allegedly assigned the contract rights to DKH, Kimball—not DKH—continued paying Brooksher's invoices through other companies that he owned. *See* (Doc.

59-1); Kimball Dep. 57:24–59:17, 207:17–208:10. To prove assignment, DKH relies exclusively on Kimball's declaration that, "[o]nce DKH was formed, [he] assigned the contract to DKH and continued to ensure payment of invoices on its behalf." Kimball Decl. ¶ 9. Ultimately, Kimball's conclusory, self-serving statements in an affidavit are insufficient to survive summary judgment. *See Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

**2. Statute of Frauds**

Even had DKH established its right to sue, the defendants succeed on the statute of frauds defense because the parties "intended and contemplated that performance of the agreement would take longer than one year." *Dwight v. Tobin*, 947 F.2d 455, 459 (11th Cir. 1991) (citation omitted).

As Kimball testified, "the deal was, is that in exchange for 25 percent of the company . . . [Brooksher] would reduce his [hourly] rate." Kimball Dep. 207:24–208:6; Brooksher Decl. in Opp. to Prelim. Inj. ¶ 13 ("RJB billed my development time to Kimball at half my normal billing rate because . . . I expected to co-own the new food delivery business."). "[I]f [Brooksher] didn't -- if he didn't make it to the two-year end point, then he would just -- he left before the two years, then it would be a wash." Kimball Dep. 208:7–10; *see id.* 51:22–52:4 ("[A]fter two years Brooksher's 25 percent interest would vest."). Although Kimball and Brooksher describe an agreement that could not be fully performed within one year, DKH replies that "[t]he vesting schedule for the

offer of ownership was tied to the shareholders' agreement," not the "consulting contract." DKH Reply at 6. In DKH's telling, the separate "consulting contract had no time requirement" because it was terminable at-will and "was performed not in years, but in increments measured in hours and days, as documented in the written invoices under the contract for which payment was received." *Id.*

For DKH's theory to hold water, the shareholders' agreement—which Brooksher never signed—must be independent from the "consulting contract," or, more precisely, each "consulting contract" contained within each invoice. *Cf. Odom v. Celebrity Cruises, Inc.*, No. 10-23086-CIV, 2011 WL 10636151, at *4 (S.D. Fla. Feb. 23, 2011) ("[W]here one party trades a set of promises for the other party's set of promises, the contract is indivisible, making severance inappropriate."). But Kimball's testimony contradicts any claim that "[t]he two-year vesting period had nothing to do with the consulting contract." DKH Resp. to MSJ at 10. Instead, Kimball testified that "*in exchange* for 25 percent of the company," which could not vest earlier than two years, Brooksher agreed to "reduce his rate" by fifty percent. *See* Kimball Dep. 207:24–208:6 (emphasis added); *id.* 50:20–22 ("[Brooksher] wanted to be part of the company, which is why he agreed to cut his rate to half to keep working on it."); Kimball Decl. in Opp. to MSJ ¶ 5; Brooksher Decl. ¶ 33. To the extent that DKH's argument turns not on severability but on a theory of partial performance, that argument

also fails: "[i]t is now well established that partial performance of a contract for personal services is not an exception to the provisions of the Statute of Frauds." *Johnson v. Edwards*, 569 So. 2d 928, 929 (Fla. 1st DCA 1990) (citation omitted).

Because the statute of frauds applies to the "oral contract" at the heart of DKH's claim, *see* 2d Am. Compl. ¶ 54, DKH must provide evidence of a signed writing "contain[ing] all of the essential terms" of the parties' agreement. *Walsh v. Abate*, 336 So. 3d 50, 53 (Fla. 4th DCA 2022) (citation omitted). Although DKH suggests that this writing "can take almost any possible form," DKH Reply at 6, the invoices here do not suffice because they lack any mention of Brooksher's promised equity. Nor do Slack messages between Kimball and Brooksher reduce this point to a signed writing, let alone clarify the disputed ownership of the software for which Brooksher billed his time. *See* (Doc. 137-11) at 4. At most, Brooksher wrote that "two years is reasonable" for equity to vest but suggested he would "like to get it tightened up as well." Ex. E at 25–26. Despite those conversations, Brooksher claims that "[n]egotiation on the finer points of corporate formation continued throughout the engagement, but an agreement never materialized." Brooksher Decl. ¶ 33; *see* Sandman Dep. 102:3–103:1. DKH's evidence does not rebut that claim.

Because the defendants are entitled to summary judgment on DKH's breach of contract claim, or alternatively, on the statute of frauds affirmative defense, I do not reach the defendants' copyright preemption argument.

**B. Breach of Fiduciary Duty**

DKH claims that Brooksher served as its director and CTO and thus owed DKH a fiduciary duty. *See* 2d Am. Compl. ¶¶ 75–79. According to DKH, Brooksher violated his fiduciary duty "by stealing the data and database, software and source code of DKH, destroying DKH's code repositories, destroying the operability of the Delivery Kick Application, and attempting to appropriate for his own the software and source code of DKH by filing for a copyright registration." *Id.* ¶ 80. The defendants move for summary judgment, claiming that Brooksher was not a director of DKH and that he did not breach a duty. *See* RJB MSJ at 8–18. Insofar as DKH pleads a claim for punitive damages related to this breach, the defendants claim they are entitled to summary judgment because "[t]here is no evidence that Brooksher had actual knowledge of wrongfulness or the requisite intent." RJB MSJ at 24–25. Genuine disputes of material fact preclude summary judgment on this claim.

Under Florida law, a breach of fiduciary duty requires a showing of: (1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damages that stem as a proximate result of such a breach. *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). The parties' relationship need not be evidenced by a

contract. *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). "If a relation of trust and confidence exists between the parties . . . that is sufficient as a predicate for relief." *Id.* (quoting *Quinn v. Phipps*, 113 So. 419, 421 (1927)) (emphasis omitted). A fiduciary duty may be implied by law, and such relationships are premised upon the specific factual situation surrounding the transaction and the relationship of the parties. *See Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994). Notably, "[o]fficers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of authority or neglect of duty." *Taubenfeld v. Lasko*, 324 So. 3d 529, 538–39 (Fla. 4th DCA 2021) (citation omitted).

Although Brooksher disputes that he was an officer or director of DKH, DKH identifies sufficient record evidence to create a genuine dispute of material fact. Notably, Kimball claims that he and Brooksher "agreed on the formation of DKH with each of [them] directors" and that "documents were prepared to form DKH." Kimball Decl. ¶¶ 13–14. DKH was then incorporated on August 1, 2023, with both Kimball and Brooksher listed as directors. JSUF ¶ 1; Ex. E at 89. Kimball then forwarded multiple documents—including the articles of incorporation—to Brooksher. *See* Ex. E at 96–97. Kimball separately sent Brooksher messages on Slack linking the online record of DKH's incorporation and confirming that he "sent the delivery kick corp folder to your gmail." *Id.* at 81. Brooksher tagged the message with a "heart" emoji. *See id.*

Brooksher argues that none of the above suffices because "[h]e never authorized Kimball to list him as a director and he never took any action as a director." RJB MSJ at 10. Brooksher also refused to sign bylaws identifying him as a DKH director—which Sandman confirmed were never filed—and did not sign the "Written Consent" appointing him as director. *See* Brooksher Decl. ¶¶ 25, 37; Sandman Dep. 102:3–103:1, 203:16–204:23; Written Consent (Doc. 137-5). Without his signature, Brooksher contends that the Written Consent is ineffective under Florida law. RJB MSJ at 12 (citing § 607.0821(2), Fla. Stat.). Brooksher also argues that he was never appointed CTO and thus had no duty as an officer. *Id.* at 8–10. In support, Brooksher avers that there is no "board resolution appointing Brooksher as CTO," no bylaws, and no evidence that Kimball "notified Brooksher in writing that he was CTO." RJB MSJ at 10 (citing Kimball Dep. 227:7–228:10). These deficiencies are dispositive, Brooksher says, because, under Section 607.08401(1), Florida Statutes, "[a] corporation shall have the officers described in its bylaws or appointed by the board of directors in accordance with the bylaws."

Brooksher's factual counterpoints reiterate the dispute regarding whether he consented to serve as a director in the first place. As for the claim that his appointment was never legally effective, Brooksher does not contest that DKH was lawfully incorporated, *see* JSUF ¶ 1, and he fails to explain "how pre-incorporation activities could violate statutes governing ongoing corporate

formalities," DKH Resp. to MSJ at 12. The written consent, which is a "Record of Action Taken by Board of Directors," presupposes the existence of DKH's directors, *see* Written Consent, and Brooksher provides no basis to conclude that articles of incorporation are insufficient to appoint a corporation's initial slate of directors. Indeed, Florida law provides that the articles of incorporation "must set forth . . . [t]he names and addresses of the individuals who are to serve as the initial directors." § 607.0202, Fla. Stat.; *cf. Heron at Destin W. Beach & Bay Resort Condo. Ass'n, Inc. v. Osprey at Destin W. Beach*, 94 So. 3d 623, 629 (Fla. 4th DCA 2012) ("Bylaws are rules adopted by an organization for its internal governance; however, these rules are subordinate to the Articles of Incorporation or the organization's constitution.").

Post-incorporation, Brooksher's conduct suggests that he understood his role as a director or officer of DKH. Weeks after DKH was incorporated, "Brooksher met Kimball at the bank to open the DKH bank account with both listed as signatories." DKH Resp. to MSJ at 12; Ex. E at 82–84, 86. Brooksher held himself out as DKH's CTO in an email sent to a third party in October 2023, Kimball Decl. ¶ 14; Ex. E at 90, and the next month he executed a contract with Zyte on behalf of DKH, representing himself as CTO, Ex. E at 91–95. A reasonable jury could conclude that Brooksher owed DKH a fiduciary duty "premised upon the specific factual situation surrounding . . . the relationship of the parties." *Capital Bank*, 644 So. 2d at 518.

In turn, if Brooksher owed DKH a duty, there is also a dispute of fact regarding whether Brooksher breached that duty by deleting software and source code from AWS infrastructure purportedly owned by DKH.

"[D]isloyal conduct — such as fraud, self-dealing, usurping corporate opportunities, diverting revenues, or other betrayal of trust — constitutes a breach of fiduciary duty under Florida law." *Peyton v. Grant*, No. 24-CV-21649, 2026 WL 327936 (S.D. Fla. Feb. 6, 2026). According to Brooksher, in March 2023 he began writing "software and developing a database for a food delivery service application which RJB would own and would allow [Brooksher and Kimball's] new food delivery company to use." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 13. And Brooksher "discussed" with Kimball that Brooksher would own all work that invoiced for after that point. *See* Brooksher Dep. 85:14–21. Kimball, on the other hand, maintains that "[a]t all times, this infrastructure and the resulting data were created under my direction and for the benefit of DKH." Kimball Decl. ¶ 17; Kimball Dep. 48:10–15, 227:9–16.

Because a factfinder could reasonably credit Kimball's testimony over Brooksher's, that same factfinder could also conclude that Brooksher engaged in self-dealing and breach of trust by deleting "snapshots associated with the AWS EC2 instances associated with rbrooksher@deliverykick.com" and "the AWS S3 buckets associated with rbrooksher@deliverykick.com," even if Brooksher authored the code therein in the first place. JSUF ¶¶ 9, 11. That is

all the more true because Brooksher testified that the food delivery application he was building—while being paid by Kimball—"would be competitive with" Kimball's envisioned application. *See* Ex. E at 14.

To the extent that Brooksher resists this conclusion by asserting that "DKH has not demonstrated ownership of any software or source code" that he authored, RJB MSJ at 13, I disagree. As explained below with respect to the trade secrets claims, there is a genuine dispute of material fact surrounding which source code Brooksher authored (and whether it was derivative of code authored by DKH's contractors), who possessed that specific code as well as the scraped data within the AWS infrastructure funded by Kimball, and whether Brooksher's deletion of data from that infrastructure rendered the Delivery Kick platform inoperable.[6] Based on evidence pointing in each direction on these questions, the defendants do not convince me that a reasonable jury would be unable to find for DKH on the fiduciary duty claim.

For largely the same reasons, and because Kimball testified that Brooksher removed data knowing it belonged to DKH, a reasonable jury could

[6] Because Brooksher's alleged misappropriation of trade secrets forms nearly the entire basis of DKH's fiduciary-duty claim, it is possible that the FUTSA displaces the claim. *See Miner, Ltd. v. Sanacore*, No. 8:25-CV-1538-KKM-TGW, 2025 WL 2410641, at *2 (M.D. Fla. Aug. 20, 2025) (concluding that the FUTSA displaced the plaintiff's fiduciary duty claim that the defendant "misappropriate[ed] [the plaintiff's] trade secrets and confidential information for the benefit of himself and his new employer while continuing to have ownership interest in MHS, and to the detriment of [the plaintiff].""). The defendants, however, do not raise this argument.

also find that DKH "prove[d] evidence of fraud, malice, or misconduct that would justify punitive damages." *Wells Fargo Bank, N.A. v. Gopher*, 397 So. 3d 1033, 1034 (Fla. 4th DCA 2024); § 768.72(2), Fla. Stat. The defendants' motion is denied with respect to DKH's claim for punitive damages.

**C. Trade Secrets Claims**

DKH asserts trade secrets claims under both the FUTSA and DTSA, which may be analyzed together because the statutes are largely the same. *See Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1311 n.13 (11th Cir. 2020) (analyzing FUTSA and DTSA claims together); *Freedom Med., Inc. v. Sewpersaud*, 469 F. Supp. 3d 1269, 1275 n.6 (M.D. Fla. 2020) (same). To prevail on a claim under either statute, the plaintiff must show that "(1) it possessed a trade secret and (2) the secret was misappropriated." *Compulife*, 959 F.3d at 1310 (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018)); *see* § 688.002, Fla. Stat.

Under the DTSA, the plaintiff must prove that he was the "owner" of the trade secret. *See* 18 U.S.C. § 1836(b)(1). "Owner" is defined as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Highland Consulting Grp., Inc. v. Minjares*, 74 F.4th 1352, 1358 (11th Cir. 2023) (quoting 18 U.S.C. § 1839(4)). Similarly, under the FUTSA, a plaintiff must show that he "possessed secret information." *Poet*

*Theatricals Marine, LLC v. Celebrity Cruises, Inc.*, 307 So. 3d 927, 929 (Fla. 3d DCA 2020) (citation modified).

A trade secret is information that derives economic value from not being generally known to others. *See* 18 U.S.C. § 1839(3); § 688.002(4), Fla. Stat. Accordingly, a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 10 So. 3d 202, 205 (Fla. 4th DCA 2009) (quoting § 688.002(4), Fla. Stat.). Entering into written confidentiality agreements, restricting access to the trade secrets, and requiring the destruction of copies of confidential materials are examples of reasonable measures to protect trade secrets. *Sea Coast Fire, Inc. v. Triangle Fire, Inc.*, 170 So. 3d 804, 809 n.1 (Fla. 3d DCA 2014). For the FUTSA claim, "[w]hen there is no express agreement, the party seeking protection must establish the existence of a 'confidential relationship . . . giv[ing] rise to an implied obligation not to use or disclose' a trade secret." *DePuy Synthes Prods., Inc. v. Veterinary Orthopedic Implants, Inc.*, 990 F.3d 1364, 1372 (Fed. Cir. 2021) (applying Florida law) (quoting *Dotolo v. Schouten*, 426 So. 2d 1013, 1015 (Fla. 2d DCA 1983)).

Misappropriation can occur by "acquisition, disclosure, or use." *Compulife*, 959 F.3d at 1311 (citing § 688.002(2), Fla. Stat.). Misappropriation by acquisition requires that the defendant "knows or has reason to know that the trade secret was acquired by improper means." *Compulife*, 959 F.3d at 1311

(quoting § 688.002(2)(a), Fla. Stat.). "Misappropriation occurs whenever a defendant acquires the secret from its owner 'without his permission at a time when he is taking reasonable precautions to maintain its secrecy.'" *Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1162 (11th Cir. 2024), *cert. denied sub nom. Rutstein v. Compulife Software, Inc.*, 145 S. Ct. 1172 (2025).

Both parties move for summary judgment on DKH's DTSA and FUTSA claims, as well as on the defendants' copyright preemption affirmative defense. Specifically, DKH "seeks an [o]rder finding Defendants misappropriated data of DKH stored in a database on its AWS account," but not with respect to "any limited internal testing activity." DKH MSJ at 7–8. I start first with copyright preemption before explaining why genuine disputes of material fact—evidenced by competing, largely admissible expert opinions—preclude awarding party summary judgment to either party.

**1. Copyright Act Preemption**

The Copyright Act does not preempt DKH's state law claim for misappropriation of trade secrets because DKH's rights under the FUTSA are not "equivalent to" the exclusive rights provided by Section 106 of the Copyright Act. I therefore grant DKH's motion for summary judgment on the defendants' preemption affirmative defense. *See* Am. Aff. Defs. (Doc. 89) ¶ 2.

As I explained in a previous order, "[t]here is 'no doubt that the Florida trade secret statute . . . satisfies the 'extra element' test' because the breach of

duty requirement 'qualitatively distinguishes" the claim from copyright infringement." (Doc. 57) at 8–9 (quoting *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1549 (11th Cir. 1996)).

The defendants' counterarguments do not disturb this conclusion. In their affirmative motion, the defendants argue in a footnote that "[t]he claim that Brooksher unlawfully 'copied' software or a database is preempted by the Copyright Act." RJB MSJ at 22 n.5. Elsewhere, the defendants elaborate that *Bateman* is in their favor because the Eleventh Circuit there reversed the district court's judgment award to the plaintiffs "because of the lack of substantial evidence establishing an obligation of confidentiality." *See* RJB Resp. to MSJ at 22 (citing *Bateman*, 79 F.3d at 1550). That is true. But the plaintiffs' failure to satisfy the "extra element," i.e., a confidential relationship, is distinct from preemption. So, even if the defendants were correct that the evidence does not show a confidential relationship between DKH and the defendants, the defendants would win on that basis alone, not on preemption. DKH is entitled to summary judgment on this affirmative defense.

**2. *Daubert* Motions**

At the heart of the parties' dispute is whether "the software for the Delivery Kick project, DKH's website and database/data contained therein, as well as the configuration and assembly of its database and servers" are trade secrets, whether DKH possessed or owned those trade secrets, and whether

Brooksher misappropriated the trade secrets by transferring them from AWS servers associated with the deliverykick.com domain name. *See* DKH MSJ at 3. Both parties seek to introduce (and exclude) expert opinion testimony relevant to each point of disagreement. I address each motion in turn.

**a. Motion to Exclude or Limit the Opinions of Donald Waldhalm**

The defendants' software development expert, Donald Waldhalm, offers opinions related to the authorship and possession of "software artifacts related to this matter."[7] Waldhalm Report (Doc. 134-4) at 11. First, Waldhalm opines "that Brooksher is the sole author of the code for which he requested copyright." *Id.* at 9. Waldhalm opines that "Brooksher has always had exclusive possession of RJB-ui, RJB-backend, and RJB-database; and Brooksher, Kimball, and Mindbowser have all possessed DeliverySite-ui and DeliverySite-backend." *Id.* at 11. DKH moves to exclude Waldham's opinions, or to limit Waldhalm exclusively to descriptive testimony, because his opinions are neither relevant nor reliable. *See* DKH *Daubert* Mot. at 7. The defendants primarily respond that DKH's arguments "go to the weight and credibility, rather than admissibility, of Waldhalm's opinions." RJB *Daubert* Resp. at 2 (Doc. 145). I agree.

---

[7] "While source code represents the human-readable instructions, the artifacts themselves are the executable, operational instances that ran in the AWS environment." Waldhalm Report at 13.

As to the relevance of Waldhalm's first opinion, DKH asserts that "[a]uthorship of code submitted for copyright is not a fact of consequence" for evaluating its trade secrets claims, which focus on ownership or lawful possession. *See* DKH *Daubert* Mot. at 7. To be sure, the copyright standard for original authorship is distinct and not an element of DKH's trade secrets claims. Although "authorship" is not synonymous with ownership or possession under the DTSA or FUTSA, the defendants persuade that "Brooksher's authorship of that code is one fact to consider" in making that determination, as well as in assessing whether Brooksher acquired the code by improper means. RJB *Daubert* Resp. at 4–5; *see* 18 U.S.C. §§ 1839(4)–(5). That is, it is arguably more likely that Brooksher "owned" or "possessed" code that he authored than code that he did not. Waldhalm's opinion thus meets the "liberal" standard for assessing relevance. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009).

Waldhalm's methods are also sufficiently reliable to survive the *Daubert* standard. To the extent "original authorship," a term pertinent to copyright protection, is relevant here, DKH contends that "Waldhalm's opinion rests on an unreliable premise: he equates Git commit metadata (who committed code to a repository) with authorship (who created the underlying code and whether it is sufficiently original)." DKH *Daubert* Mot. at 8. According to DKH, Brooksher's own deposition testimony refutes any basis "to conclude that the

person who saved a file into a Git repository is the" file's author or owner. *Id.* at 9–10 (citing, e.g., Brooksher Dep. 123:12–15 (Q: Well, the git commit record doesn't tell you who authored it. It just tells you who put it in the repository, right? A: That's correct.")). But Waldhalm bases his authorship opinion on more than Git commit data, as he also "reviewed the contents of the code bases," Waldhalm Decl. (Doc. 145-1) ¶ 5, and the "access records" to the individual repositories, *id.* ¶ 7; *see* Waldhalm Report at 9–11. Waldhalm then "used git-blame on every file to aggregate all contributors," Waldhalm Report at 9, which revealed unique authors whose contributions Waldham discounted as "germane neither to food delivery nor to the relatively advanced database integration that separates RJBdelivery from the Mindbowser code set," *id.* at 10. Ultimately, to the extent that DKH posits that Waldhalm's methodologies fail to support his authorship opinion or contradict Brooksher's testimony, DKH may raise these issues through "[v]igorous cross-examination" and the "presentation of contrary evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

Turning to ownership, DKH again challenges Waldhalm's opinion as irrelevant and unreliable, contending that Waldhalm's methodologies relate only to Brooksher's present possession of various artifacts, *see* DKH *Daubert* Mot. at 13, even though Waldhalm claims that Brooksher "has *always had* exclusive possession of RJB-ui, RJB-backend, and RJB-database," Waldhalm

Report at 11 (emphasis added); Waldhalm Decl. ¶¶ 11–12. Once again, DKH's arguments go to the weight, and not admissibility, of Waldhalm's opinion.

To investigate Brooksher's alleged "possession" of the RJB-ui, RJB-backend, and RJB-database artifacts, Waldhalm "reviewed Brooksher's live AWS account, on a screen-share session with him." Waldhalm Report at 12. Then, with respect to "three running EC2 instances," Waldhalm reviewed the authorized SSH keys and "observed no indication that anyone other than Brooksher has a keypair that would gain access." *Id.* Waldhalm confirmed this observation by reading the transcript of Kimball's deposition, wherein Kimball testified that although he "had access to the AWS console," he was not sure whether Brooksher ever gave him private keys to access the EC2 instances. *See* Kimball Dep. 202:4–204:19.

DKH avers that Waldhalm never investigated pre-June 2024 access to the various RJB artifacts, and thus claims "[i]f remotely watching one long into an online account or reading Mr. Kimball's deposition is all that is required for 'possession,' any lay jury member is capable of these tasks." DKH *Daubert* Mot. at 14. But Waldhalm offers a bit more. He also reviewed Brooksher's GitHub account and "Brooksher's AWS administrator credentials and IAM Config for the account where Brooksher stored the software artifacts and database," albeit only "after May 2024." RJB *Daubert* Resp. at 15; Waldhalm Report at 13 ("observ[ing] only one user–an admin credential with no console access").

Although Waldhalm's opinion is primarily based on the state of Brooksher's AWS account *after* he removed data from the "AWS EC2 instances associated with rbrooksher@deliverykick.com," JSUF ¶¶ 8–12, he explains that Kimball could never have accessed Brooksher's AWS account because Kimball "stat[ed] that he never had the requisite SSH key, and would not have known how to use it." Waldhalm Decl. ¶ 14. To the extent that DKH seeks to cast doubt upon the limits of Waldhalm's review, it may do so through cross-examination.

For purposes of admissibility, I agree with the defendants that there is not "too great an analytical gap" between Waldhalm's proffered opinion and the facts supporting it. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). DKH's motion is therefore denied.

**b. Motion to Exclude or Limit the Opinions of Mark Fussell**

The defendants move to exclude or limit the opinions of DKH's software expert, Mark Fussell, offered in both his initial and rebuttal reports. *See* RJB *Daubert* Mot. More specifically, the defendants move to exclude Fussell's opinions that (1) DKH funded the development of the RJB code and database, (2) the scraper code in the RJB software is based on the design of the CB-19X (Mindbowser) code base, (3) the RJB code contained features absent from the Mindbowser code base, (4) Brooksher spent less time working on Mindbowser than on the RJB code and database, and (5) DKH owned the database and software created by Brooksher. *See id.* at 4–10. The defendants argue that

these opinions are either irrelevant, based on unreliable methods, or improperly raised for the first time in Fussell's rebuttal report. *See id.* at 10–14. Except for certain opinions that purport to offer legal conclusions and other portions that DKH does not contest, I disagree.

**i. Initial Report**

To start, Fussell's opinion in his initial report that Kimball and DKH funded the development of the software is neither irrelevant to the trade secrets (or breach) claims nor redundant of what DKH's attorneys "can argue in closing arguments." *Id.* at 4 (citing *United States v. Frazier*, 387 F.3d at 1262–63). So too with Fussell's related opinion about how Brooksher spent his invoiced time. *See id.* at 7. Both opinions address Brooksher's authorship of, and entitlement to, the contested source code, as well as DKH's potential damages. As for helpfulness, the defendants even concede that Fussell did more than simply review Brooksher's invoices. Fussell also "compar[ed] the descriptions of services in RJB's invoices with records showing activity occurring in the RJB software." *Id.* at 4; *see* Fussell Dep. (Doc. 138-3) 24:19–22, 32:1–14 (discussing the comparison of invoices with "activities summary," including "git repositories"). As DKH notes, Brooksher's invoices are both voluminous and their descriptions highly technical, beyond the understanding of an average lay person. *See* DKH *Daubert* Resp. (Doc. 142) at 4–5 (arguing that Fussell analyzed "code derivation, repository structure, and data location"

relative to Brooksher's time entries). "It is certainly helpful to the jury to have an analysis of the voluminous data from the [invoices and activity records] provided to them rather than reviewing all the data [therein] themselves to reach a [conclusion]." *Sihler v. Glob. E-Trading, LLC*, No. 8:23-CV-1450-VMC-LSG, 2025 WL 1425400, at *7 (M.D. Fla. May 16, 2025).

Similarly, Fussell's opinion that the scraper code in the RJB software is based on the design of the Mindbowser code base and that the RJB code contained features absent from the Mindbowser code base are directly relevant to the trade secrets claims. *See* RJB *Daubert* Mot. at 6–8. Although the defendants argue that they "have never claimed ownership of the Mindbowser scraping code or of any of the scraping code," *id.* at 6, Fussell's opinion is not so limited. Instead, Fussell opines that certain code allegedly possessed by DKH (or Kimball) "has the same functionality as code Defendants now claim to own." DKH *Daubert* Resp. at 7 (citing Fussell Initial Report (Doc. 139-1) ¶¶ 86–87). Indeed, Fussell's rebuttal report identifies hundreds of lines of code that were registered by Brooksher but authored by others. *See* Fussell Rebuttal Report (Doc. 139–2) ¶¶ 144–56. Because these opinions are relevant to DKH's purported possession of the trade secret material and whether the defendants misappropriated it, the defendants' motion fails on this point.

Next, in addition to claiming that Fussell's opinions are irrelevant, the defendants also argue that they are unreliable. *See* RJB *Daubert* Mot. at 7–8.

More specifically, the defendants claim that Fussell used two unverified tools—"diff -y" and "CMR"—to compare the Mindbowser and RJB code sets. *See id.* at 7. As DKH explains, however, "diff -y" is "simply a utility in the Linux operating system, that displays the comparison of code in a side-by-side format." DKH *Daubert* Resp. at 8 & n.3. And contrary to the defendants' assertion, Fussell testified that he has used the "diff -y" program on "dozens of occasions" to compare code, albeit not in a report submitted in litigation. *See* Fussell Dep. 57:13–24. Similarly, CML, conventionally known as YAML, is a "human-readable data serialization language," DKH *Daubert* Resp. at 9 & n.4, that has been used in the computer science field since the 1990s, *see* Fussell Dep. 66:18–24. Courts routinely admit code comparisons using similar tools. *See Compulife*, 959 F.3d at 1308 (noting that a side-by-side comparison of source code evidenced copying); *see also Xtec, Inc. v. CardSmart Techs., Inc.*, No. 11-cv-22866, 2014 WL 10250974, at *5 (S.D. Fla. Dec. 4, 2014) (admitting expert testimony relating to the similarities revealed by a side-by-side comparison of source codes). To the extent that the defendants seek to further challenge Fussell's code comparison methodologies, they may do so on cross-examination and through the introduction of competing evidence.

**ii. Rebuttal Report**

The defendants also contend that Fussell's rebuttal opinions regarding possession, authorship, and development must be excluded because Fussell

was required to disclose those opinions—"offered in support of Plaintiff's burden of proof"—in his initial report. *See* RJB *Daubert* Mot. at 10–12 (citing FED. R. CIV. P. 26(a)(2)(B)(i) and 37(c)(1)). But the defendants do not oppose the introduction of Fussell's rebuttal opinions "in the event [Defendants] introduce opinion testimony on these topics during the defense case." *Id.* at 11.

Ordinarily, "[a] plaintiff who knows that the defendant means to contest an issue that is germane to the prima facie case (as distinct from an affirmative defense) must put in his evidence on the issue as part of his case in chief." *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016) (citation modified). Accordingly, "[a] party may not offer testimony under the guise of 'rebuttal' only to provide additional support for his case in chief." *Id.*; *Bell v. Progressive Select Ins. Co.*, 692 F. Supp. 3d 1121, 1124–25 (M.D. Fla. 2023) (similar). At the same time, "[t]he rules do not require parties or their expert witnesses to anticipate all foreseeable opposing arguments and meet those arguments in their initial reports." *Teledyne Instruments, Inc. v. Cairns*, No. 6:12-cv-854-Orl-28TBS, 2013 WL 5781274, at *17 (M.D. Fla. Oct. 25, 2013). A rebuttal opinion may still be introduced. "The test under Rule 26(a)(2)(D)(ii) is not whether a rebuttal report contains new information, but whether it is 'intended solely to contradict or rebut evidence on the same subject matter' of an opponent's expert report." *Id.* (citations omitted).

Here, Fussell's rebuttal opinions satisfy the Rule 26 standard. In its case in chief, DKH must prove that it possessed and safeguarded trade secrets and that the defendants misappropriated them. In his initial report, Fussell offers opinions relevant to those issues, including that DKH's AWS infrastructure was "password protected and automatically encrypted by default," "[t]he entire CB-635 [RJB] code base is related to the work provided to seed that code base," and that "[t]he evolution of CB-635 [the RJB codebase] was funded by invoicing RJB made to DKH/Kimball." Fussell Initial Report ¶¶ 113, 174–76. As explained, to reach those conclusions, Fussell relied on RJB's invoices, a side-by-side comparison of the respective code bases, and the repository commitment histories. *See generally* Fussell Initial Report.

By contrast, Fussell's rebuttal report directly addresses the opinions of Donald Waldhalm, opining that "RJB did not have *exclusive possession* of the code within CB-635 and CB-636 [the RJB codebase]," "RJB was not the *exclusive author* of the code within CB-635 and CB-636," and that "RJB significantly leveraged DKH resources for the development of [his food delivery application]." *See* Fussell Rebuttal Report ¶¶ 219–223 (emphasis added). Contrary to the defendants' view, all three opinions "are intended solely to contradict or rebut evidence on the same subject matter" of Waldhalm's report,

which focused on the parties' access to respective AWS systems.[8] *See Teledyne Instruments*, 2013 WL 5781274, at *17. Because DKH need not prove that its possession, access, or authorship was exclusive to establish its "rightful legal or equitable title to, or license in, the trade secret," 18 U.S.C. § 1839(4), I disagree that Fussell's rebuttal report improperly "disguise[s] support for his . . . case in chief as rebuttal evidence." *GLF Constr. Corp. v. Fedcon Joint Venture*, No. 8:17-CV-1932-T-36AAS, 2019 WL 13168545, at *6 (M.D. Fla. Oct. 16, 2019). Accordingly, Fussell may offer the above identified opinions in rebuttal.

Next, in a challenge to a more limited portion of Fussell's rebuttal report, the defendants argue that Fussell's "claims . . . that the UserQuery records are valuable and not recoverable records of user interactions" is unreliable because Fussell "did not review the data itself or check whether it was test data." RJB *Daubert* Mot. at 12. But that is not dispositive of whether those records were valuable. Instead, Fussell's opinion is based on sufficiently reliable methods because he relied on "an additional breakdown of the time and records contained in the database (including the user interaction data)," including

[8] To the extent that the defendants fault Fussell for addressing Riley Brooksher's October 15, 2024 declaration, which was filed "one and a half years before Fussell prepared his Initial Report," *see* RJB *Daubert* Mot. at 11, Fussell did so only because Waldhalm relied on that declaration in forming his opinion regarding possession, *see* Waldhalm Report at 13.

"information about the query itself," such as when it was made, "and information about who made the query." DKH *Daubert* Resp. at 12; Fussell Rebuttal Report ¶¶ 83–103.

The defendants also seek to exclude Fussell's rebuttal opinions that "RJB has no valid claim on DK-DB-1 at all," that "the DeliveryKick.com database as it existed on and before June 10th, 2024 is owned by DKH," RJB *Daubert* Mot. at 8, or that "[e]ven if the [food delivery application] is validly solely possessed by RJB, it was clearly provided and de-facto licensed to DKH to operate in the DKH AWS production environment." Fussell Rebuttal Report ¶¶ 201, 224. According to the defendants, these statements constitute impermissible legal opinions. *See* RJB *Daubert* Mot. at 8–9, 12–13. DKH contends that Fussell offers a technical opinion, not a legal one, about who " 'owns' the accounts and resources therein." DKH *Daubert* Resp. at 9. Both sides are partially correct.

To the extent that Fussell "provide[s] a technical analysis of both software code and the associated database" and the location of RJB's code on the DKH AWS account, *id.* at 9, his opinions are admissible. And his methodologies appear sufficiently reliable. Although the defendants are correct that Fussell testified that he "d[id] not know whether any such evidence [was] entered into this case" showing that DKH had access to the AWS account before June 10, 2024, Fussell explained that he reviewed the "CloudTrail analysis logs," Fussell Dep. 120:13–25; *see* (Doc. 139-5). In part based on that

review, Fussell opined that "DKH had master administrative control associated with the AWS account and could disable and takeover any AWS credentials associated within that account." Fussell Rebuttal Report ¶ 128. Insofar as the defendants contend that the logs "show that Kimball's access of the account only occurred after all removal and deletion of RJB's property," RJB *Daubert* Mot. at 13 (emphasis omitted), they may attack Fussell's opinions and methods on cross-examination and with competing evidence.

On the other hand, "an expert witness may not testify as to his opinion regarding ultimate legal conclusions." *United States v. Delatorre*, 308 F. App'x 380, 383 (11th Cir. 2009) (per curiam); *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) ("A witness also may not testify to the legal implications of conduct; the court must be the jury's only source of law."). Fussell therefore may not testify to what software or source code DKH lawfully owned or licensed, in effect the ultimate legal question of "rightful legal or equitable title to" the trade secrets at issue. *Highland Consulting*, 74 F.4th at 1358. To that end, Fussell shall not use the "moniker" of "DKH-owned" that is referenced throughout the rebuttal report, although he may testify to DKH's access or control of, or payment for, the relevant AWS account. *See* DKH *Daubert* Resp. at 11 (conceding that this language could be "tweaked"); *see also* Fussell Dep. (Doc. 137-5) 120:11–12 ("I am not a lawyer and I'm not giving legal testimony on [ownership].").

Finally, the defendants argue that "Fussell's arguments as to human readability of the React application built from RJB's delivery_ui repository (CB-636) are not based on facts" because "Fussell never evidences an attempt to build the application" by "running the requisite 'npm run build' command." RJB *Daubert* Mot. at 13–14. The defendants do not explain why Fussell should have run this command or how his failure to do so renders his opinion as to the human readability of RJB's "FDA ui" unreliable. Fussell Rebuttal Report ¶ 39. The defendants' motion is therefore denied as to this portion of Fussell's report.

**3. Genuine Disputes of Material Fact**

In the light of the largely admissible expert opinions of Donald Waldhalm and Mark Fussell, outstanding factual disputes on each element of the DTSA and FUTSA claims preclude summary judgment.

Normally, the presence of non-conclusory conflicting expert testimony, relevant to the issues under consideration, generally shows that summary judgment is not proper. *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011); *Tropic Sun Towers Condo. Ass'n, Inc. v. Zurich Am. Ins. Co. of Illinois*, No. 605CV-1284ORL-18DAB, 2006 WL 3544854, at *2 (M.D. Fla. Dec. 8, 2006) ("This type of disagreement between expert witnesses is a textbook example of when summary judgment should be denied.").

Start first with whether the restaurant records and related codebase on the DKH-associated AWS servers qualify as a trade secret, i.e., whether it "has independent economic value from being kept secret and is in fact subject to reasonable efforts to maintain its secrecy." *Compulife*, 111 F.4th at 1160. To be sure, "even if individual [records] that are publicly available lack trade secret status, the whole compilation of them (which would be nearly impossible for a human to obtain through the website without scraping) can still be a trade secret." *Id.* at 1162. But "[t]he question of whether information constitutes a trade secret is a question of fact normally resolved by a jury after full presentation of evidence." *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018).

According to DKH, "the 700,000 restaurant records contained in the database that resided in DKH's AWS account were harvested using sophisticated engineering infrastructure, proxy/data-access systems, and significant cost, time and technical expertise." DKH MSJ at 4. And the additional "approximately 700,000 records in the database were created from proprietary user interactions with DKH's own website." *Id.* at 10. Because the data "is organized in a way not available to the public," DKH contends that it is a trade secret. DKH Resp. to MSJ at 17; Kimball Decl. ¶ 22. The defendants respond that "[t]he scraped restaurant data is not a trade secret because it is not secret," [s]ince anyone can use a web scraper program to scrape public

websites for the same restaurant data claimed to be owned by DKH." RJB Resp. to MSJ at 15–16. Further, "all alleged user data was the product of internal testing and automation created by Brooksher." *Id.* at 14; Brooksher Decl. ¶¶ 3–6.

In addition to competing deposition testimony and communications between Kimball and Brooksher capable of multiple inferences, the parties' experts also disagree. Waldhalm contends that the "DeliverySite codebase includes web scrapers that collect menu item data from publicly available websites," and thus "the data they collect is readily available to the public from the same sources the scrapers access." Waldhalm Report at 8, 13. Fussell disagrees, contending that because the "production database [had] a goal of many users using a large amount of information (in this case, hundreds of thousands of restaurants)," "[t]he data, the schema, and the configuration all provide significant value." Fussell Rebuttal Report ¶ 81. In Fussell's view, "it seems reasonable to assume that performance limitations would make it take multiple weeks of continuous activity to reproduce the 700K restaurants within the DK-DB-1 database," *id.* ¶¶ 91–95, whereas the user records "are not equivalently recoverable at all," *id.* ¶ 97. Those user records—and the query table associated with it—"could be used for valuable analytics." *Id.* ¶ 98. These competing opinions are sufficient to create a dispute of material fact about

whether the database and associated source code derived independent economic value from being kept secret.

There are also genuine disputes of material fact regarding whether DKH made reasonable efforts to keep the information secret.

Brooksher claims that "Kimball never informed [him] that anything he was doing was a trade secret or should be kept confidential," and denies that Kimball "required MindBowser or any of the independent consultants engaged through Toptal® to keep anything confidential." Brooksher Decl. in Opp. to Prelim. Inj. ¶ 38; *see* Brooksher Decl. ¶ 36. And it is undisputed that DKH and the defendants lacked a confidentiality agreement. On the other hand, Kimball avers that he "discussed confidentiality and security with Brooksher multiple times, including the need to keep the code, database, data, and AWS/server materials protected from public access and from unnecessary third-party access." Kimball Decl. in Opp. to MSJ ¶¶ 9–10. In text messages, Brooksher assured Kimball that unidentified third parties were "not going to see our code or anything." Ex. E at 74. To that end, Kimball declares that all data and code was "stored in password-protected repositories, password protected AWS/server environments, and other restricted systems." Kimball Decl. in Opp. to MSJ ¶ 10. Fussell supports Kimball's position, as he claims that the AWS infrastructure was "password protected and automatically encrypted by default." Fussell Initial Report ¶¶ 113, 174–76.

Although the lack of a written confidentiality agreement necessitates that DKH show "an understanding of confidentiality" between the parties. *DePuy Synthes*, 990 F.3d at 1372, DKH's evidence suffices. A reasonable jury could conclude that, based on Kimball and Fussell's testimony and the communications between Kimball and Brooksher, DKH took reasonable steps to keep the information secret. As relevant here, "[r]estricting access to information through authorized users via passwords may be considered as an acceptable measure to establish trade secret protection." *Humanitary Med. Ctr., Inc. v. Artica*, No. 8:23-CV-1792-WJF-TGW, 2023 WL 8779956, at *3 (M.D. Fla. Dec. 19, 2023).

Finally, there is a genuine dispute of material fact about whether DKH or the defendants "possessed secret information," *Poet Theatricals Marine*, 307 So. 3d at 929, or are "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Highland Consulting*, 74 F.4th at 1358 (quoting 18 U.S.C. § 1839(4)). Because Brooksher does not dispute that he "remove[d] 'snapshots,' from the account i.e., backups of AWS EC2 instances of the software that [he] authored that AWS created as [he] was creating the software," Brooksher Decl. in Opp. to Prelim. Inj. ¶ 32; JSUF ¶¶ 8–11, whether Brooksher misappropriated the data through acquisition effectively collapses into the access or ownership inquiry. *See*

*Compulife*, 959 F.3d at 1311 (explaining that misappropriation can occur by "acquisition, disclosure, or use").

Once again, Waldhalm and Fussell disagree about who authored, had access to, or owned the relevant dataset and codebase. Collectively, Waldhalm's opinion that the defendants exercised "exclusive possession of RJB-ui, RJB-backend, and RJB-database," *see* Waldhalm Report at 11, his opinion that Brooksher authored the code, as well as Kimball and Brooksher's statements regarding DKH's access, *see* Kimball Dep. 202:6–21; Brooksher Decl. in Opp. to Prelim. Inj. ¶ 15, could permit a reasonable jury to conclude that "Brooksher created the software and database on his own personal computer and then kept copies on a repository that Brooksher alone controlled." RJB MSJ at 19.

Conversely, Fussell's opinions could permit a reasonable jury to draw the opposite conclusion, that "[t]he DKH database, and the dataset therein, resided in its AWS account for http://deliverykick.com until June 10, 2024."[9] DKH MSJ at 13; *see* Fussell Initial Report ¶ 188; Fussell Rebuttal Report ¶¶ 114–189. To

---

[9] Insofar as the defendants argue that DKH neither owned nor possessed any trade secrets "because DKH did not have a server to hold the data, and never paid money to anyone for use of a server," I disagree. RJB Resp. to MSJ at 19–20. There is sufficient evidence for a jury to conclude that Kimball paid for software development on behalf of DKH, to benefit and be owned by DKH, even though DKH was not necessarily "a party to a contract with anyone for storing data, developing web scrapers, or executing a scraping campaign." *See id.*

the extent that Brooksher contends that he alone authored the code for which he obtained a copyright registration, Fussell's opinion that "[p]arts of the materials submitted for copyright registration had code that was initially written by another, and the RJB code bases had significant unattributed contributions by other authors" creates a factual dispute for jury resolution. *See* Fussell Rebuttal Report ¶¶ 221–22.

Finally, the collective record evidence—including communications between Kimball and Brooksher, as well as Brooksher's representations that he was DKH's CTO—is capable of an inference that Brooksher "kn[ew] or ha[d] reason to know that the trade secret was acquired by improper means" at the time he removed or "acquired" data from an AWS server for which he did not pay. *Compulife*, 959 F.3d at 1311.

In the light of these factual disputes, bolstered by a battle of admissible expert testimony, neither party is entitled to summary judgment on DKH's trade secrets claims under the DTSA or FUTSA.

**D. Damages**

Lastly, the defendants move for summary judgment on DKH's claim for damages because until the final day of discovery, DKH "failed to disclose any damages, either in its Rule 26 disclosures, in answer to Defendants' damage interrogatory or in response to Defendants' request for documents." RJB MSJ at 22–23; (Doc. 137-10). DKH responds that there is no basis "for the

proposition that producing evidence on before the discovery cutoff is a violation of the Federal Rules." DKH Resp. to MSJ at 19. DKH is largely incorrect.

Under Federal Rule of Civil Procedure 26(a)(1)(A)(iii), a party must, without awaiting a discovery request, provide "a computation of each category of damages claimed" and must also make available for inspection and copying the documents or other evidentiary material on which each computation is based. "A party is not excused from making its disclosures because it has not fully investigated the case." FED. R. CIV. P. 26(a)(1)(E). Under Rule 26(e), a party who makes a disclosure under Rule 26(a) must supplement its disclosure in a timely manner if the party learns the initial disclosure is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the opposing parties during the discovery process or in writing.

Under Rule 37(c), if a party fails to provide information as required by Rule 26(a) or (e), the party is not allowed to use that information to supply evidence on a motion, at a hearing, or at a trial, "unless the failure was substantially justified or is harmless." The untimely party bears "the burden of establishing that a failure to disclose was substantially justified or harmless." *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (per curiam). "In determining whether the failure to disclose was justified or harmless, [courts] consider the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the

opposing party if the information [is] admitted." *Lips v. City of Hollywood*, 350 F. App'x 328, 340 (11th Cir. 2009) (per curiam).

Here, DKH did not timely disclose its damages calculations under Rule 26(a). In its initial disclosures made in November 2024, DKH stated that it "has yet to calculate the total damages resulting from Defendants' actions, but will supplement this information after receiving discovery." (Doc. 137-4) at 3–4. Then, in response to discovery requests served by the defendants in May 2025, DKH promised to produce non-privileged documents and claimed that it "anticipates relying on expert testimony to articulate its damages theories, and will timely produce an expert disclosure based on the schedule set by the Court." *See* (Docs. 137-7, 137-8, 137-9). DKH "did not disclose a damages expert and did not disclose any damages by the February 2, 2026 [expert] disclosure deadline." RJB MSJ at 23. Just over a month later, on the final day of discovery, DKH timely supplemented its responses and identified its damages: "$326,961.84 in vendor expenses, the diminished value of the Delivery Kick application and database, lost time in the market for the Delivery Kick application, fees, costs and punitive damages." *Id.* (citing Doc. 137-10).

Although the supplemental response was filed within the discovery period, Rule 26(e) " 'does not give license to sandbag one's opponent' by belatedly disclosing information that should have been included in the initial disclosures." *Bespoke Studio, Inc. v. Gabbe Priv. Ltd.*, 348 F.R.D. 262, 265 (N.D.

Fla. 2024) (citation omitted). In other words, DKH could not "supplement" a Rule 26(a) disclosure it never timely made in the first place. And DKH does not adequately explain that its failure to comply with Rule 26 was substantially justified. Nor does it persuade that its failure was completely harmless, at least not with respect to all theories of damages.

On this front, DKH contends that the defendants "never requested or took the deposition of a DKH corporate representative to ask about damages" and "elected not to file a discovery motion on this issue." DKH Resp. to MSJ at 19. But Rule 26 disclosures must be made "without awaiting a discovery request." FED. R. CIV. P. 26(a)(1)(A). And DKH points to no authority mandating that the defendants move to compel Rule 26 damages disclosures before seeking exclusion under Rule 37 (even if doing so is better practice). Ultimately, "[t]he alleged lack of initiative on the part of Defendants does not excuse Plaintiff's failure to fulfill its affirmative responsibilities under Rule 26." *K3 Enters., Inc. v. Sasowski*, No. 20-24441-CIV, 2022 WL 3306725, at *4 (S.D. Fla. Aug. 11, 2022).

In a similar vein, DKH suggests that its untimely disclosure was harmless because the defendants "declined an invitation to depose DKH's corporate representative," DKH Resp. to MSJ at 19, which DKH offered the day *after* discovery closed, (Doc. 144-5) at 2. This argument also fails. "Implicit in [DKH's] argument is the implication that the harmfulness of [its] untimely

disclosure could be cured if the Court reopened discovery so that [the defendants] can conduct discovery on [its damages] computation." *Direct Components, Inc. v. Microchip USA, LLC*, No. 8:23-CV-1617-VMC-SPF, 2025 WL 3763923, at *13 (M.D. Fla. Dec. 30, 2025). That concedes that failing to disclose such information before the final day of discovery was harmful.

That said, the harm to the defendants is not equal across the categories of DKH's late-disclosed damages. As DKH notes, before discovery concluded Kimball "testified that he believed the damages included 'the damages that I'm seeking because I'm having to repair . . . the stolen assets from my company,' including money paid to 'Mindbowser, Toptal, some developers off at Behance. I mean, other developers.'" DKH Resp. to MSJ at 19 (quoting Kimball Dep. 172:20–173:3). To the extent that DKH's supplemental disclosure identified "$326,961.84 in vendor expenses," RJB MSJ at 23, the defendants cannot claim to be surprised by such figures. In fact, to the extent those expenses represent "the total sum paid to develop the Delivery Kick application and database prior to its theft by Defendants," (Doc. 137-10) at 6, Brooksher invoiced Kimball for much of that work and "produced countless emails referring to and approving many of these expenses. He signed multiple contracts related to these expenses." (Doc. 144-5) at 3. I therefore do not find it appropriate to exclude evidence of damages related to the cost to "develop the Delivery Kick

application and database prior to its theft by Defendants and the attempt to rebuild the application thereafter." (Doc. 137-10) at 6.

But the same cannot be said for "the diminished value of the Delivery Kick application and database" and "lost time in the market for the Delivery Kick application." (Doc. 137-10) at 6. To start, proving these damages theories damages will likely require "complex[] [] damages computations" to assess the opportunity costs related to delay and the current value of the application compared to what its present value would have been if Delivery Kick operated as an ongoing concern from the projected start date. *See Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1308 (11th Cir. 2021) (citing *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1222 (11th Cir. 2010)). In other words, requiring DKH to rebut these damages without having adequate notice before trial of the specifics of these damages theories strongly suggests harm. *See id.* But notwithstanding whether these categories are too speculative or if DKH could prove them without expert testimony, DKH points to no discovery before—deposition testimony or otherwise—that would have fairly apprised the defendants of these damages theories or their ultimate magnitude before the final day of discovery. *See Mee Indus.*, 608 F.3d at 1222 (upholding the exclusion of a damages theory under Rule 37 when the party failed to give timely notice of the theory). To the extent that DKH suggests that the defendants should have accepted the invitation to depose DKH's corporate

representative, "this implicitly acknowledges that [the defendants] [were] in fact prejudiced by [DKH's] untimely disclosure, as [the defendants] [were] deprived of a meaningful opportunity to perform discovery and depositions related to" these categories within the Court's established discovery window. *See Direct Components*, 2025 WL 3763923, at *13. Thus, DKH "is not allowed to use that information . . . at trial." FED. R. CIV. P. 37(c). The defendants' motion for summary judgment is granted with respect to these two categories of damages.

## IV. CONCLUSION

I grant DKH's motion for partial summary judgment with respect to the defendants' affirmative defense of preemption under the Copyright Act, *see* Am. Aff. Defs. ¶ 2, but deny the motion insofar as it seeks summary judgment on DKH's claims under the DTSA and FUTSA. Because expert Donald Waldhalm's opinions are relevant and supported by sufficiently reliable methodologies, I also deny DKH's *Daubert* motion to exclude or limit Waldhalm's opinions or testimony.

I grant the defendants' motion for summary judgment as to DKH's claim for breach of contract (Count III) and with respect to DKH's request for damages related to "the diminished value of the Delivery Kick application and database" and "lost time in the market for the Delivery Kick application." I deny the defendants' motion for summary judgment in all other respects.

Additionally, I grant in part the defendants' *Daubert* motion to exclude or limit the opinions or testimony of Mark Fussell regarding DKH's legal ownership of the disputed software in this matter. The motion is otherwise denied.

The matter shall proceed to trial on DKH's claims for violations of the DTSA (Count I) and FUTSA (Count II), as well as its claim for breach of fiduciary duty (Count VI). The following is therefore **ORDERED:**

1. Delivery Kick Holdings, Inc.'s Motion for Partial Summary Judgment (Doc. 132) is **GRANTED IN PART and DENIED IN PART.**

2. Delivery Kick Holdings, Inc.'s *Daubert* Motion (Doc. 133) is **DENIED.**

3. Defendants' Motion for Summary Judgment (Doc. 136) is **GRANTED IN PART and DENIED IN PART.**

4. Defendants' *Daubert* Motion (Doc. 138) is **GRANTED IN PART and DENIED IN PART.**

**ORDERED** in Tampa, Florida, on September 14, 2026.

Kathryn Kimball Mizelle
United States District Judge